IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, AND COMMONWEALTH OF VIRGINIA, *ex rel.* DWIGHT OLDHAM, <br><br>  Relator, <br><br> v. <br><br> CENTRA HEALTH, INC., <br><br>  Defendant. | Civil Action No.  6:18-cv-88 <br><br> **JURY TRIAL DEMANDED** |

**AMENDED COMPLAINT**

Plaintiff-Relator Dwight S. Oldham, M.D., by and through undersigned counsel, brings this action against Defendant Centra Health, Inc. ("Centra"), under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, the Virginia Fraud Against Taxpayers Act, Va. Code §§ 8.01-216.1, *et seq.*, and on common law grounds outlined in more detail herein.

## Introduction

1.  Centra, through its employees and subsidiary companies and entities, submitted false claims to the United States government and Commonwealth of Virginia in connection with breast imaging services by improperly and illegally controlling the referral process for the treatment of newly diagnosed breast cancer patients, thereby allowing Centra to conduct diagnostic imaging that was not medically required and without valid orders. Dr. Oldham sought to better understand Centra's unusually high utilization rates for several forms of oncology diagnostic tests and better manage oncology care in order to prevent unnecessary testing and billing. As a direct result of Dr. Oldham's investigation into these problems, Centra unlawfully retaliated against Dr. Oldham for his actions, thereby violating the anti-retaliation provisions of

1

the FCA, the VFATA, and the contract between Dr. Oldham's practice (Lynchburg Hemotology Oncology Clinic, Inc., or "LHOC") and Centra.

## Jurisdiction and Venue

2. This action arises under the False Claims Act, as amended, 31 U.S.C. §§ 3729-3733. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, and subject matter jurisdiction under the federal False Claims Act, 31 U.S.C. § 3729, *et seq*.

3. The Court has supplemental jurisdiction to entertain the Virginia law claims pursuant to 28 U.S.C. § 1367(a) and 31 U.S.C. § 3732(b).

4. This Court has personal jurisdiction of the Defendant because Centra can be found in and transacts business in the Western District of Virginia.

5. Venue lies in this district under 28 U.S.C. § 1391(b) & (c) and 31 U.S.C. § 3732(a) because the Defendant transacts business and has committed acts in violation of 31 U.S.C. § 3729 in this district.

## The Parties

6. Plaintiff Dwight Oldham, M.D., is an adult citizen and resident of the Commonwealth of Virginia.

7. Defendant Centra Health, Inc. is a Virginia corporation with its principal place of business in Lynchburg, Virginia.

## Legal Framework

8. The Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, provides, *inter alia*, that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made

or used, a false record or statement material to a false or fraudulent claim," is liable to the United States for a civil monetary penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B).

9. The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii). Proof of specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1)(B).

10. The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Governments behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ." 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

11. "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

12. The Virginia Fraud Against Taxpayers Act ("VFATA") provides, in part, that any person who:

> (A)(1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (A)(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> [or]

3

    (A)(3)  Conspires to commit a violation of subdivision 1, 2, 4, 5, 6, or 7:

    [s]hall be liable to the Commonwealth for a civil penalty of not less than $5,500 and not more than $11,000, plus three times the amount of damages sustained by the Commonwealth.

Va. Code Ann. § 8.01-216.3.

  13. The VFATA defines "knowing" and "knowingly" as meaning that "a person, with respect to information, (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information" and requires no proof of specific intent to defraud. Va. Code Ann. § 8.01-216.3(C).

### Medicare/Medicaid Billing

  14. Services provided to Medicare and other federal health care program beneficiaries are only reimbursable if they are medically necessary. *See* 42 U.S.C. § 1395y(a)(1)(A) ("no payment may be made under part A or part B of this subchapter for any expenses incurred for items or services. . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member"); 42 C.F.R. § 411.15(k)(1); Medicare Carrier's Manual § 2049. Medicare and other federal health care programs only cover medical services that are reasonable and necessary for the diagnosis or treatment of illness or injury.

  15. Accordingly, providers may only submit claims for government healthcare reimbursement for "reasonable and necessary" medical services. In submitting claims, providers make certain express certifications, including an assurance that the services were "provided economically and only when, and to the extent, medically necessary." 42 U.S.C. § 1320c-5(a)(1); *see also* 42 U.S.C. § 1395n(a)(2)(B) (to receive payment for claims providers must certify that

services were "medically required"). Moreover, in submitting reimbursement to obtain reimbursement from Medicare or other Federal health care programs, health care providers expressly certify "that the services shown on [the] form were medically indicated and necessary for the health of the patient." Thus, each time a claim for payment is submitted to a Federal healthcare program, the provider expressly certifies that the services performed were medically justified. In addition, each time a provider submits a claim, the provider impliedly certifies that the service was provided in accordance with Federal and State statutes, regulations, and program rules.

16. The Medicare Program Integrity Manual ("MPIM"), which provides guidance on how to determine whether items or services are "reasonable and necessary for the diagnosis or treatment of illness",[1] instructs Medicare contractors to use the strongest evidence of medical necessity available and provides a list of evidence in order of preference:

> Published authoritative evidence derived from definitive randomized clinical trials or other definitive studies, and General acceptance by the medical community (standard of practice), as supported by sound medical evidence based on:
>
> ○ Scientific data or research studies published in peer-reviewed medical journals;
>
> ○ Consensus of expert medical opinion (i.e., recognized authorities in the field); or
>
> ○ Medical opinion derived from consultations with medical associations or other health care experts.

17. MPIM § 13.7.1. The MPIM further provides:

> Acceptance by individual health care providers, or even a limited group of health care providers, normally does not indicate general acceptance by the medical community. Testimonials indicating

---

[1] MPIM, CMS Pub. No. 100–08, Ch.13, available at http://www.cms.gov/Regualtions-andGuidance/Manuals/Internet-Only-Manuals-IOMs.html.

such limited acceptance, and limited case studies distributed by sponsors with financial interest in the outcome, are not sufficient evidence of general acceptance by the medical community. The broad range of available evidence must be considered, and its quality shall be evaluated before a conclusion is reached.

18. Knowingly causing the submission of claims that are ineligible for payment under a federal health care program constitutes a violation of the FCA. Similarly, a claim for "worthless" medical care violates the FCA because the government believes it is paying for services or items that have medical value when, in fact, the services or items are essentially worthless.

19. To be medically necessary, diagnostic procedures "must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." 42 C.F.R. § 410.32(a).

20. 42 C.F.R. § 410.32(d)(3) further provides,

> (i) … Upon request by CMS, the entity submitting the claim must provide the following information:
>
> (A) Documentation of the order for the service billed (including information sufficient to enable CMS to identify and contact the ordering physician or nonphysician practitioner).
>
> (B) Documentation showing accurate processing of the order and submission of the claim.
>
> (C) Diagnostic or other medical information supplied to the laboratory by the ordering physician or nonphysician practitioner, including any ICD–9–CM code or narrative description supplied.

21. If adequate documentation is not supplied, CMS must deny the claim. *Id.* at 410.32(d)(3)(ii)(C).

22. Federal healthcare programs may also require billing entities to supply such documentation as may be deemed necessary to support coverage.

23. Every Medicare supplier is charged with knowledge of Medicare regulations and with the understanding that Medicare does not provide reimbursement for services that are not properly documented.

**LHOC/Centra Merger**

24. Dr. Oldham worked with the Lynchburg Hematology Oncology Clinic ("LHOC") for several decades prior to its merger with Centra in 2014.

25. Under the merger with Centra Health, the staff of LHOC became employees of Centra Health, but the physicians remained contractors with Centra under a professional services agreement ("PSA").

26. The Centra Health/LHOC PSA became effective on September 1, 2014.

27. Under the PSA, Centra also assumed control over all pharmaceutical purchasing, and physicians were paid an incentive compensation based on productivity (using "relative value units").

28. Centra also paid physicians separately for serving as "medical director." The medical director contract involved performing tasks at a fixed compensation rate.

29. Dr. Oldham was the medical director of LHOC from 2014 until June 2017, when Centra split the medical director position.

30. Under the PSA, if Centra asserts that a physician has breached any duties of professional conduct, it may notify LHOC of this purported breach, and may only demand the removal of the physician after the physician has thirty days to cure the breach:

> The Group specifically agrees and covenants that in the event
> Centra claims that a breach of this section by a physician has

> occurred, Centra shell so notify the group in writing of the alleged breach and such breaching physician shall have 30 days after notice to cure such breach. If said breach is not cured within 30 days after such notice, Centra may remove such position from serving as medical director or providing clinical services Or terminate this agreement without further notice, and without further obligation with regard to compensation.

PSA, Section 8.

31. A copy of the relevant PSA is attached as **Exhibit 1** and incorporated herein.

### Centra Breast Imaging

32. Centra Breast Imaging is composed of a group of five physicians who are employed by Centra Medical Group, a division of Centra Health. They practice at multiple sites including Virginia Baptist Hospital, Lynchburg General Hospital, Bedford Memorial Hospital, Southside Community Hospital, and two outpatient sites in Lynchburg; Timberlake Road and Tate Springs Road. Each site has a unique National Provider Identification (NPI) number, but all are owned by Centra Health.

### Improper Pre-Authorization Form Circumvents Physician-Ordered Radiology

33. Centra Breast Imaging uses a "Mammography Appointment Request Form" common to all sites. All of these forms are sent to the ordering physician for signature with the box "Any diagnostic breast exam procedure deemed necessary" already checked. A redacted example of this form is attached as **Exhibit 2**.

34. Centra Breast Imaging used this pre-authorization form even prior to the Centra/LHOC merger. Centra uses nurse "breast navigators," who control the referrals of new patients as outlined in Exhibit 1. Breast Navigators are nurses assigned to each patient to assist them through breast cancer treatment. Centra used their control of the referral process to exclude certain physicians from seeing breast cancer patients. The control of the referral process also

intimidated physicians who participated in the breast program into tolerating overutilization of imaging by Centra.

35. The Medicare Benefit Policy Manual Chapter 15 outlines the proper parameters for diagnostic imaging and testing in Section 80. Sections 80.6.1 to 80.6.4 cover the appropriate ordering of follow-up diagnostic imaging studies. The definition of an order, the ordering physician, interpreting physician, and testing facility are specified in section 80.6.1.

36. Centra Breast Imaging group would be considered a "testing facility," under this Medicare definition.

37. CMS updated Section 80 of its policy manual specifically to stop the routine ordering of follow-up testing by radiologist interpreting physicians because of the unnecessary testing that resulted.

38. The CMS Manual outlines rules for testing facilities and interpreting physicians to furnish additional diagnostic tests in sections 80.6.3 and 80.6.4. Centra's requisition form marked "Any Diagnostic Breast Exam deemed necessary" clearly violates the Medicare policy in 80.6.3 and 80.6.4. Centra's form is not specific at all; it allows the radiologist at Centra Breast Imaging (an interpreting physician), not the treating physician, to choose what diagnostic imaging and testing should occur, in clear violation of the CMS manual.

39. A valid claim for diagnostic imaging requires a valid order (Per Section 80.6.1), thus submitting Medicare claims for payment for diagnostic imaging without a valid order is a violation of the CMS manual and the False Claims Act.

**Centra Performs Medically Inappropriate and Unnecessary Diagnostic Imaging**

40. National Coverage Determination (NCD) 220.4 contains the Medicare policy for screening mammography. It covers the coding of screening mammography with computer

assisted detection (CAD) and screening digital breast tomosynthesis. Screening services do not require an ordering physician. CMS has also created an exception that allows the interpreting physician to order a diagnostic mammogram with an abnormal screening study (42 CFR 410.32).

41. Medicare does not recognize a screening breast ultrasound.

42. There is no CPT code for a screening ultrasound, and there is no mention of it in Medicare's NCD 220.4.

43. The National Cancer Center Network ("NCCN") is a nonprofit group of cancer centers which is the developer of the most widely used guidelines for cancer care.

44. Medicare recognizes NCCN compendia in determining the appropriate use of drug therapy, and NCCN guidelines are widely used by Medicare in the development of its National Coverage Determinations. Compliance with NCCN guidelines is required for accreditation of cancer programs by the American College of Surgeons.

45. NCCN guidelines specifically recommend against the routine use of breast ultrasound for screening women with dense breasts due to high number of false positive tests leading to unnecessary breast biopsies. A copy of these guidelines is attached as **Exhibit 3**.

46. Breast ultrasound is a <u>diagnostic</u> study and orders for breast ultrasound should be compliant with the Medicare Benefit Policy Manual Chapter 15, sections 80.6.1-4. See **Exhibit 6**.

47. Despite the clear NCCN guidelines and CMS' non-recognition of using ultrasound as a screening (rather than diagnostic) procedure, Centra routinely using diagnostic breast ultrasound to <u>screen</u> women with increased breast density.

48. Diagnostic mammograms are appropriate as outlined in 42 CFR 410.32 when they are conducted to follow-up on <u>specfically identified abnormalities</u>. This regulation does not provide justification for an alternative screening program.

49. Increased breast density is a common condition (30 to 40% of patients). Diagnostic ultrasound and diagnostic mammograms are NOT appropriate for screening women with dense breasts. Beyond being simply medically inappropriate, they are being conducted without a valid order from the treating physician.

50. Dr. Oldham raised concerns regarding the use of screening ultrasound in August 2016, and Dr. Perroto acknowledged Centra's use of screening ultrasound in her August 14, 2016 email. (**Exhibit 4**).

51. The Center for Medicare Services (CMS) publishes data for utilization of imaging in its Hospital Compare Report at Medicare.gov. The Hospital Compare Report for 2016 and 2017 both showed utilization of ultrasound and MRI at after screening mammography at Centra to be significantly higher than the national average.

52. Relator Dr. Oldham has recently become aware that there is a possibility that the CMS Hospital Compare Reports of 2016 and 2017 contained inaccuracies. Dr. Oldham had no reason to doubt the accuracy of the Hospital Compare Reports in 2017 when he was making a good faith effort to implement the Oncology Care Model.

**Centra is Inappropriately Using Breast MRI Without Orders from a Treating Physician**

53. In addition to the improper use of breast ultrasound as a screening procedure, Centra is also systematically and improperly using breast MRI after diagnosis of breast cancer without a valid order from the treating physician.

54. Neither the NCCN guideline, nor the American College of Breast Surgeon's guideline for imaging after a diagnosis of breast cancer, recommend the routine use of breast MRI prior to surgery.

55. The NCCN guideline recommends MRI for mammographically occult tumors.

56. The American College of Breast Surgeons recommend MRI if needed for surgical planning.

57. Breast MRI after a diagnosis of breast cancer on biopsy should be ordered by the surgeon who is the treating physician. Instead, Centra radiologists are <u>routinely</u> ordering this procedure despite their status as interpreting physicians.

58. ***The national average for the use of breast MRI after cancer diagnosis is one in three. Centra's was 74% in 2016.***

59. While there are fewer total instances of breast MRI than improper screening ultrasound, the number of unnecessary breast MRIs conducted by Centra is between 50 and 100 a year.

60. Both breast ultrasound for dense breasts and breast MRI after a positive biopsy for cancer are very sensitive but not specific for cancer. In other words, because of their lack of specificity these diagnostic tests lead to unnecessary breast biopsies for benign breast abnormalities. This is specifically addressed in the NCCN guideline.

61. According to relevant medical literature, 1000 breast ultrasounds will lead to 50 to 100 breast biopsies, half of which are unnecessary.

62. Breast MRI leads to a similar percentage of unnecessary biopsies but also decreases the rate of lumpectomy and increases the mastectomy rate for patients who have been diagnosed with breast cancer.

63. The false claims submitted by Centra to the United States and the Commonwealth of Virginia were material because under CMS guidance, proper orders are required for payment. In other words, whether or not the diagnostic imaging was medically necessary and ordered by a proper treating physician are capable of influence the government's funding decision.

### Internal Efforts to Correct Overutilization of Breast Radiology

64. After the 2017 split in the medical director position, Dr. Oldham remained responsible for supervising the implementation of the "Oncology Care Model" outlined in the Affordable Care Act ("ACA").

65. During Dr. Oldham's tenure as the medical director, he participated in a weekly Breast Conference, which was typically attended by medical oncology, radiation oncology, surgery, breast navigators, pathology, breast imaging, and mammography.

66. During these meetings, Dr. Oldham raised concerns with the number of breast MRIs being ordered. Dr. Oldham objected to individual patients receiving breast MRI when they had already elected to have a mastectomy or before they had seen a surgeon. Ordering MRI in those instances were wasteful and unhelpful because they did not change the course of treatment.

67. In 2015, Centra agreed to participate in the Oncology Care Model (OCM) at Dr. Oldham's request. The OCM is a Medicare Advanced Payment Model.

68. Part 1 of the OCM obligates participating organizations to certain quality improvement activities. Medicare provides OCM practices a monthly payment of $160 per month per patient for quality improvement activities. This is the Monthly Enhanced Oncology Services (MEOS) payment. Part 2 of the OCM requires participating organizations to demonstrate cost savings as a result of the quality improvement activities. The first OCM cost reporting period for which cost saving was expected was July 1, 2017 through December 1, 2017

compared to the previous 12 month baseline. Practices that demonstrated cost savings were eligible for a performance based payment (PBP). The design of the OCM did not require successful cost savings to collect payments MEOS.

69. Dr. Oldham took note of Centra's unusually high number of diagnostic breast imaging studies in the first Medicare Hospital Compare report in 2016. This report was a product of the Affordable Care Act ("ACA"), which attempted to identify unnecessary medical spending.

70. The report showed Centra to be an outlier with high rates of utilization for ultrasound and MRI after screening mammogram.

71. Dr. Oldham created a meeting that he called the "Oncology Service Line Meeting." The purpose of the meeting was to organize efforts to make Centra eligible for PBP under the OCM. This included efforts to reduce unnecessary utilization in breast imaging.

72. Dr. Oldham also organized this meeting in order to bypass the Centra administrators responsible for Oncology. These individuals were Curt Baker, Vice President Oncology, and Carol Riggins, Managing Director for Pearson Cancer Center ("PCC").

73. Disturbingly to Dr. Oldham, any proposals for cost savings arising related to OCM had to be approved by Curt Baker and Carol Riggins, the administrators who were responsible for the nurse navigators and Centra Breast imaging and the system of overutilization that was in place.

74. Dr. Oldham held two meetings of the Oncology Service Line in 2016. The minutes of the second meeting from August 12, 2016 include the discussion of breast imaging and the first Hospital Compare report. The agenda and notes from this meeting are attached as **Exhibit 5**.

75. Centra cancelled subsequent meetings of the Oncology Service Line Council until Dr. Oldham could be replaced as Medical Director of Medical Oncology.

76. After the Service Line Meetings, Dr. Oldham had discussions with other physicians about an organized effort to boycott the signing of the pre-authorization requisition form that gave Centra Breast Imaging with the preselected option of unlimited additional testing. It was apparent from those discussions that no other physician understood the issue or was willing to risk losing referrals from Centra Breast Imaging.

77. In the fall of 2016, Dr. Oldham met with E.W. Tibbs, the former CEO of Centra Health, to discuss the 2016 Hospital Compare Report on breast imaging and Centra's lack of progress in meeting financial targets in OCM. Tibbs assured Dr. Oldham at the meeting that he would take corrective action.

78. Upon information and belief, Tibbs took the following steps: (1) Curt Baker was promoted to Chief Nursing Officer (a Senior Vice President) and no longer responsible for Oncology; (2) Centra demanded that Dr. Oldham be removed as Medical Director for Medical Oncology as part of LHOC's contract negotiation for renewal of its PSA with Centra. (The PSA was renewed in June of 2017 and Dr. Oldham gave up Medical Director duties, except those specifically related to the OCM); (3) Centra took no action as to Carol Riggins as Managing Director of PCC, and there were no changes at Centra Breast Imaging.

79. In August of 2017 Carol Riggins filed a complaint against Dr. Oldham for disruptive behavior with Centra Human Resources. Since Dr. Oldham is not a Centra Employee this complaint was forwarded to the Centra medical staff.

80. Dr. Oldham met with a subcommittee of the Centra Medical Staff Executive Committee ("MEC"), at which time Dr. Oldham agreed that he had made unkind remarks about Riggins outside her presence.

81. Despite the innocuous nature of the comments, Dr. Oldham received a letter of reprimand from the MEC.

82. While Dr. Oldham did not agree with the conclusions of that letter, he did not respond to it.

83. In November of 2017, Dr. Oldham reviewed the preliminary financial data for the Oncology Care Model. Centra was not eligible for a performance based payment. It was apparent that Centra was planning to participate in OCM, collect MEOS payments while continuing to over utilize imaging and other services. This maximized revenue to Centra.

84. November 23, 2017 was the Friday after Thanksgiving and the Centra Medical Oncology Office was closed for patient care. Katie Kirby (R.N.), Director of Practice Operations for LHOC, was present that day. Dr. Oldham was at the office to review his files including his calendar, old emails, and minutes of previous meetings. Dr. Oldham was preparing to file complaints with the Centra Board of Directors, The Joint Commission on Accreditation of Hospitals, and Medicare related to the Oncology Service Line Meetings and over-utilization of breast imaging.

85. In the course of a conversation with Ms. Kirby that day, she asked Dr. Oldham why he was in the office. Dr. Oldham told her that cost savings in OCM were a hopeless undertaking with the current administration and that Centra was continuing a pattern of over-utilization and refusing to implement clinical pathways or effective case management

procedures. Dr. Oldham told her that he was preparing complaints and that he hoped it would lead to the replacement of Mr.Tibbs, Mr Baker, and Ms Riggins.

86. On November 28, 2017 – two business days later - Centra banned Dr. Oldham from setting foot at any Centra facilities during a meeting with Karen Ackerman (Centra V.P. for Human Resources) and Michael Elliott (Chief Operating Officer for Centra Health). The stated reason was for threating behavior.

87. This stated reason was a pretext; the true reason for Dr. Oldham's exclusion was his stated intention of reporting Centra's fraudulent activities.

88. Dr. Oldham communicated his concerns about Centra's illegal billing activities in a December 5, 2017 email to the Chair of the Centra Board of Directors, Walker Syndor.

### V. Causes of Action

### COUNT I
### Illegal Retaliation in Violation of 31 U.S.C. 3730(h)

I. Plaintiff incorporates the foregoing paragraphs as if fully set forth in Count I.

II. As a result of the Plaintiff's effort to prevent Centra's False Claims Act violations, Centra illegally retaliated against Dr. Oldham in the terms and conditions of his employment.

III. As a result of Centra's illegal retaliation, Dr. Oldham suffered lost income, loss of professional standing and reputation, and other damages to be proven at trial.

### COUNT II
### Illegal Retaliation in Violation of Va. Code Ann. 8.01-216.8

IV. Plaintiff incorporates the foregoing paragraphs as if fully set forth in Count II.

V. As a result of the Plaintiff's effort to prevent Centra's Virginia Fraud Against Taxpayers Act violations, Centra illegally retaliated against Dr. Oldham in the terms and conditions of his employment.

VI. As a result of Centra's illegal retaliation, Dr. Oldham suffered lost income, loss of professional standing and reputation, and other damages to be proven at trial.

## COUNT III
## Breach of Contract

VII. Plaintiff incorporates the foregoing paragraphs as if fully set forth in Count III.

VIII. Plaintiff Dr. Oldham was a beneficiary of the PSA between LHOC and Centra and served as the first medical director under the PSA.

IX. Under the PSA, Centra was only authorized to terminate a physician after following a specific procedure outlined in Section 8 of the PSA, which included giving thirty days to cure any breach and affording the physician the opportunity to appeal the denial of medical privileges, seek review of the decision, and utilize the grievance process.

X. By violating the provisions of the PSA, Centra breached the terms of the PSA, which resulted in Dr. Oldham suffering significant damages to be determined at trial.

## Prayer for Relief

WHEREFORE, the Plaintiff prays that judgment be entered in his favor and against the Defendant as follows:

1. That the Plaintiff be granted reinstatement with seniority pursuant to 31 U.S.C. 3730(h), as well as two times his back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination to be proven at trial, including litigation costs and reasonable attorneys' fees;

2. That the Plaintiff be granted reinstatement with seniority pursuant to Va. Code Ann. 8.01-216.8, as well as two times his back pay, interest on the back pay, and compensation for his special damages to be proven at trial, including litigation costs and reasonable attorneys' fees;

3. That the Plaintiff be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and Va. Code Ann. 8.01-216.7;

4. That the Plaintiff be awarded all reasonable attorneys' fees and costs, pursuant to 31 U.S.C. § 3730(d)(1), 31 U.S.C. § 3730(d)(2), and Va. Code Ann. 8.01-216.7;

5. That in the event that the United States and/or Commonwealth of Virginia proceeds with this action, the Plaintiff, for bringing this action, be awarded an amount of at least fifteen percent but not more than twenty five percent of the proceeds of any award or the settlement of the claims;

6. That the Plaintiff be awarded pre-judgment and post-judgment interest; and

7. The Court award such other and further relief as is just, equitable, and proper.

**Plaintiff requests a jury on all issues so triable.**

August 11, 2020

                                                             DWIGHT S. OLDHAM

                                           By:  */s/ John R. Thomas, Jr.*
                                                       John R. Thomas, Jr.
                                                       Counsel for the Plaintiff

John R. Thomas, Jr. (VSB No. 75510)
**HAFEMANN MAGEE & THOMAS, LLC**
11 Franklin Road, SW

P.O. Box 8877
Roanoke, Virginia 24014
(540) 759-1660
jt@fed-lit.com

*Counsel for Relator*