**IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| AND COMMONWEALTH OF | ) | |
| VIRGINIA, *ex rel.* DWIGHT OLDHAM | ) | |
| | ) | Civil Action No. 6:18-cv-88 |
| *Relator*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CENTRA HEALTH, INC., | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| *Defendant*. | ) | |

## DR. OLDHAM'S MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS

Plaintiff-Relator Dwight S. Oldham, M.D., ("Dr. Oldham"), by and through undersigned counsel, files this Memorandum in Opposition to Defendant Centra Health Inc.'s ("Centra") Motion to Dismiss Plaintiff's Amended Complaint.

### INTRODUCTION

The issue before this Court is <u>not</u> whether Centra committed fraud. There are two issues in this case: whether the Amended Complaint ("AC") sufficiently alleges facts that *plausibly* plead (1) that Centra retaliated against Dr Oldham; and (2) that Dr. Oldham was a third-party beneficiary of the contract ("the contract") between Centra and the Lynchburg Hematology Oncology Clinic ("LHOC").

Centra opines on the "meritless" nature and "abandonment" of the underlying fraud claims. But this case is not about the merits of the fraud claims. Whether a "difference of opinion" among experts constitutes fraud is not an issue before this Court. To the contrary, the U.S. Supreme Court and Fourth Circuit have expressly held that a retaliation claim under the False Claims Act ("FCA") does <u>not</u> require a showing of fraud. Moreover, unlike substantive fraud claims, which are subject

1

to Rule 9(b)'s heightened pleading requirements, retaliation claims must pass only Rule 8(a)'s "relatively low" notice pleadings bar. Under that standard, the AC more than sufficiently alleges that Dr. Oldham engaged in protected activity, put Centra on notice thereof, and that Centra took adverse employment action against him. The AC also sufficiently alleges that Dr. Oldham was indeed an intended third-party beneficiary of the contract.

## STATEMENT OF FACTS

Dr. Oldham is a highly respected physician who, for several decades, worked as an oncologist with LHOC. AC ¶ 24. On September 1, 2014, LHOC merged with Centra. Id. at ¶ 25-26. Under the merger, LHOC's staff became employees of Centra while LHOC's physicians remained contractors under a Professional Services Agreement ("PSA" or "the contract"). Id. at ¶ 25-27. The contract between Centra and LHOC, as well as the surrounding circumstances of the merger, show that the parties specifically intended to retain LHOC's physicians by providing certain rights and benefits to them, such as incentive compensation as well as separate compensation for medical directors. Id. at ¶ 27-29. Dr. Oldham was the medical director of LHOC even after the merger with Centra, from 2014 until June 2017, when Centra split the medical director position. Id. at ¶ 29. Among other things, section 8 of the contract between Centra and LHOC expressly provides that if Centra asserts that a physician (such as Dr. Oldham) has breached any duties of professional conduct, Centra shall provide written notice of the alleged breach and "such breaching physician shall have 30 days after notice to cure such breach" before Centra may remove him or her. Id. at ¶ 30-31 (emphasis added).

While serving in his role as medical director after the merger, Dr. Oldham became aware of what he reasonably believed was medically inappropriate and unnecessary screening mammography and diagnostic imaging. Id. at ¶ ¶ 40-52. Specifically, Dr. Oldham noticed that

2

Centra was routinely utilizing—and billing for—screening (rather than diagnostic) breast ultrasounds even though "Medicare does not recognize a screening breast ultrasound" and "there is no CPT code for screening ultrasound." Id. at ¶ 41-47. Dr. Oldham raised concerns on multiple occasions about what he believed were improper medical and billing practices by Centra. He specifically complained that Centra's use of diagnostic ultrasounds and mammograms is not recognized by CMS and not appropriate for screening women with dense breasts. Id. at ¶ 47-51. For example, Dr. Oldham raised concerns to Dr. Perroto, who acknowledged Centra's use of *screening* ultrasounds (a practice not recognized by Medicare). Id. at ¶ 50. Dr. Oldham also specifically complained about the number of "unnecessary breast MRIs conducted by Centra," which he alleged were "systematically and improperly" done without orders from a *treating* physician. Id. at ¶¶ 53-62. Instead of being ordered by a treating physician, Dr. Oldham alleged that "Centra radiologists are <u>routinely</u> ordering this procedure despite their status as interpreting physicians." Id. at ¶ 57. Based on his firsthand observations and the information available to him at the time, Dr. Oldham reasonably believed that Centra's use of breast MRI after diagnosis was 74%, while the national average was only one in three. Id. at ¶ 58-59.

Dr. Oldham escalated his investigative and whistleblowing activities by undertaking other efforts to stop what he believed were medically unnecessary and fraudulent activities not coded for, or recognized by, Medicare. Specifically, the AC alleges that Dr. Oldham complained to Centra's management and at staff meetings about the number of breast MRIs being ordered and the fact that these practices actually made Centra ineligible for performance-based payments (which depended on cost savings). Id. ¶¶ 65-71. Not only does the AC allege that Dr. Oldham complained about these "wasteful" practices at "weekly meetings," but it also alleges that he went above and beyond to try to stop this practice by creating a new meeting called "Oncology Service

Line Meetings." Id. at ¶ 71. The purpose of this new meeting was to stop what Dr. Oldham believed was unnecessary and fraudulent utilization of screening ultrasounds and breast MRIs. Id. When Centra cancelled these meetings, the AC further alleges that Dr. Oldham engaged in other efforts to stop these violations. For example, the AC alleges Dr. Oldham attempted to lead an "organized effort to boycott" the signing of the pre-authorization forms that allowed "unlimited additional testing"—a practice Dr. Oldham believed was medically improper and therefore fraudulent under Medicare's CPT codes but nonetheless implemented to "maximize[] revenue to Centra." Id. at ¶¶ 76 & 83. Dr. Oldham then met directly with Centra's management, former CEO E.W. Tibbs, to specifically complain about these fraudulent practices, which made Centra ineligible for Medicare's OCM financial payment program. Tibbs "assured Dr. Oldham at the meeting that he [Tibbs] would take corrective action." Id. at ¶ 77. Instead, the AC alleges that Tibbs and Centra retaliated against Dr. Oldham and demanded that he be removed as medical director. Id. at ¶ 78.

Finally, the AC specifically alleges that on Friday, November 23, 2017, Dr. Oldham was observed in his office by Katie Kirby, the Director of Practice Operations, "preparing to file complaints with the Centra Board of Directors." Id. at ¶ 84. When asked why he was there, Dr. Oldham told the Director that Centra was continuing its pattern of improper practices and that he was therefore "preparing complaints" against Centra and its management. Id. at ¶ 85. On November 28, 2017—just two business days later—Centra banned Dr. Oldham from setting foot at any Centra facility. Id. at ¶ 86. After being banished from the building, Dr. Oldham sent an email to Walker Sydnor, the Chair of Centra's Board of Directors, about Centra's illegal billing activities.

### STANDARD OF REVIEW

**A. Allegations of retaliation are subject only to Fed. R. Civ. P. 8(a)'s "relatively low notice-pleadings standard," *not* Rule 9(b)'s heightened pleading requirements**

It is well-established that an FCA retaliation claim does *not* require a showing of fraud.[1] *See* United States ex rel. Grant v. United Airlines Inc., 912 F.3d 190 (4th Cir. 2018) (explaining that "[u]nlike Grant's substantive FCA claims, retaliation claims under § 3730(h) are not subject to Rule 9(b)'s heightened particularity requirement. Instead, a plaintiff need only satisfy Rule 8(a)'s notice-pleading standard."). *Accord* Young v. CHS Middle East, LLC, 611 Fed. Appx. 130, 134 (4th Cir. 2015) ("While the Youngs' allegations may well be insufficient to state a False Claims Act fraud claim subject to Rule 9(b)'s heightened pleading standards, they make no such claim. Instead, they make only a retaliation claim subject to Rule 8(a)'s notice pleadings standard."); United States v. Ndutime Youth & Family Servies, Inc., 2020 WL 5507217 *20 (E.D. Va. September 11, 2020) ("Importantly, a plaintiff need not prove an underlying FCA violation because, as the Supreme Court has explained, §3730(h) protects an employee's conduct 'even if the target of an investigation or action to be filed was innocent.' (quoting Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel Wilson, 545 U.S. 409, 416 (2005) (internal citation omitted).

Allegations of retaliation under both the FCA and the Virginia Fraud Against Taxpayers Act ("VFATA") need "pass only Civil Procedure Rule 8(a)'s relatively ***low notice-pleadings muster***." Young, 611 Fed. Appx. At 132 (emphasis added); Guilfoile v. Shields, 913 F.3d 178, 188 (1st Cir. 2019) ("This standard is consistent with the legislative intent that '[p]rotected activity [for purposes of an FCA retaliation claim] should ... be interpreted ***broadly***.'") (internal citations omitted) (emphasis added). This Court is obligated only to view the Plaintiff's pleadings, and "to view them ***generously*** in [the Plaintiff's] favor." Young, 611 Fed. Appx. at 133 (emphasis added).

---

[1] Nor does the government's decision to decline intervention necessarily suggest that there was no fraud. Rather, the government's decision could be based on any number of factors, including the amount of recovery at stake, the availability of federal resources, and the priorities of the office.

**ARGUMENT**

**A.  Retaliation.**

To sufficiently plead a 31 U.S.C. § 3730(h) retaliation claim under Rule 8(a)—and survive a Rule 12(b)(6) motion to dismiss—a plaintiff must allege facts sufficient to support a 'reasonable inference' of three elements: (1) he engaged in protected activity; (2) his employer was on notice of the protected activity; and (3) his employer took adverse action against him as a result. Grant, 912 F.3d at 200. (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)); Smith v. Clark/Smoot/Russell, 796 F.3d 424, 433 (4th Cir. 2015).

**1.  Dr. Oldham engaged in "protected activity," as interpreted by the Fourth Circuit**

As to the first element, the AC sufficiently alleges that Dr. Oldham engaged in protected activity. The Fourth Circuit recognizes two types—or two "prongs"—of protected activity under 31 U.S.C. § 3730(h): (1) acts "in furtherance of an FCA action" (the "first prong"), or (2) "other efforts to stop 1 or more [FCA violations]" (the "second prong"). Grant, 912 F.3d at 200.

**a.  Congress broadens the scope of "protected activity" to include "other efforts" and the Fourth Circuit follows by adopting the "objective reasonableness" test**

When determining whether a plaintiff engaged in protected activity, the Fourth Circuit now requires the Court to apply only an "objective reasonableness" standard to the second prong. Because Congress amended § 3730(h) in 2010 to include the second type of activity, that is, to include "other efforts to stop one or more violations of the FCA," the Fourth Circuit has expressly held that "the amended language broadens the scope of protected activity." Id. at 201 (emphasis added).  As a result of the 2009 and 2010 amendments to the FCA's whistleblower provisions, protected activity now "plainly encompasses *more than* just activities undertaken in furtherance of a False Claims Act lawsuit." Id. (quoting Smith, 796 F.3d at 434) (emphasis added). This change represents a significant expansion of the pre-2009 retaliation test, whereby courts applied only the

old "distinct possibility" standard (which Centra frequently cites) that required employees to show that their activity was protected because litigation was a "distinct possibility" and their conduct could have reasonably led to a viable FCA action. Id. at 200. This is no longer the standard. Today, the Fourth Circuit expressly rejects the "distinct possibility" standard for the second prong and instead adopts the "objective reasonableness" test. In so doing, the Fourth Circuit, like its sister circuits, has broadened the scope of activity protected by the FCA's retaliation provision.

### b. Protected activity now includes investigative acts, including collecting information about a possible fraud even before a plaintiff puts together "all the pieces of the puzzle"

Under the new objective reasonableness standard, "an act constitutes protected activity where it is motivated by an objectively reasonable belief that the employer is violating, *or soon will violate*, the FCA." Grant, 912 F.3d at 201-02 (emphasis added). The Grant Court further explained that "[a] belief is objectively reasonable when the plaintiff alleges facts sufficient to show that he believed his employer was violating the FCA, that this belief was reasonable, that he took action based on that belief, and that his actions were designed to stop one or more violations of the FCA." Id. at 201-02. These acts need only have a nexus to the FCA; they "need not lead to a viable FCA action." Id.

Protected activity now includes *both* whistleblowing *and* investigative acts, including "collecting information about a possible fraud, even before the plaintiff puts together 'all the pieces of the puzzle.'" Young, 611 Fed. Appx. at 133 (internal citations omitted). A plaintiff, in other words, need not be planning a *qui tam* action or even acting "in furtherance of" one; he may simply be investigating or collecting information about possible fraud. Acts undertaken to investigate, stop, or bring possible fraud to an end thus constitute protected activity (*even if* those acts are not in furtherance of an FCA claim). United States ex rel. Reed v. KeyPoint Government Solutions,

923 F.3d 729, 766 (10th Cir. 2019) ("Congress added the 'other efforts to stop' language for a reason—namely, to stretch the 'protected activity' umbrella to cover additional conduct.") (internal citations omitted); Smith, 796 F.3d. at 434 (explaining that protected activity plainly encompasses more than acts undertaken in furtherance of an FCA action).

### c.  Like the plaintiffs' activities in <u>Grant</u> and in <u>Young</u>, Dr. Oldham's activities plainly constitute protected activity under controlling law in the Fourth Circuit

In Grant, the Fourth Circuit reversed the dismissal of the plaintiff's retaliation claim. The district court initially dismissed because Grant failed to allege that "he conducted any investigation or took any steps in furtherance of commencing a FCA action before his termination." Grant, 912 F.3d at 202. On appeal, the Fourth Circuit noted that the district court applied the wrong standard. Adopting the objective reasonableness standard, the Fourth Circuit held that Plaintiff Grant's Second Amended Complaint ("SAC") sufficiently alleged that Grant *was* engaged in protected activity, even though his efforts were not "in furtherance of" an FCA action. Specifically—and in striking similarity to Dr. Oldham's allegations—Grant's SAC alleged that the plaintiff: ***complained on multiple occasions*** "in person and in writing" about the defendant's failure to use proper tools; ***voiced these concerns to several managers***; ***was observed investigating*** and taking pictures, after which he was ***"immediately escorted out of the building;"*** and soon after ***wrote an email to the defendant's Managing Director*** accusing the company of "trying to pass the buck" to the U.S. government instead of fixing the discrepancies. Id. at 202-03 (emphasis added). The Fourth Circuit reasoned that these activities "did not merely express concern about regulatory non-compliance, but instead alleged specific illegal, fraudulent conduct against the government." Id. The Court held that Grant ***"raised concerns about this practice to management,"*** and that these efforts <u>were</u> sufficient to permit a trier of fact to find that Grant engaged in **<u>"efforts to stop"</u>** what he reasonably believed was possible fraud. Id. at 202 (emphasis added).

In <u>Young</u>, the Fourth Circuit also reversed the district court's dismissal of the retaliation claim and held that the Youngs plausibly pled protected activity. <u>Young</u>, 611 Fed. Appx. at 133.   In <u>Young</u>, the defendant, CHS, had a services agreement with the government to provide medical services to non-military personnel in Iraq. That contract required CHS to ensure that its staff was properly trained and certified. Pursuant to that contract (between the U.S. Government and CHS), CHS hired the Youngs, both "experienced nurses," to work as surgery medical nurses. <u>Id</u>. at 131. In their Second Amended Complaint ("SAC"), the Youngs specifically alleged that Mr. Young ***noticed CHS attempting to use expired medicine*** and ***told his supervisors*** that using them was illegal and violated CHS's contractual requirements with the government. Further, the SAC alleged that ***Mrs. Young "expressed concern"*** and told a supervisor about the lack of equipment and properly trained medical personnel, which she said was ***"totally misleading."*** <u>Id</u>. Mrs. Young then "shared her concerns" at a ***staff meeting***, after which both Youngs "escalated" their concerns to management. Mr. Young ***told the director of internal operations*** that he believed CHS's management was defrauding the government, i.e., that CHS listed emergency medical technicians as scrub technicians for surgery even though they had no surgical experience. <u>Id</u>. The Youngs eventually contacted the State Department to further escalate their concerns, after which they were terminated two days later. <u>Id</u>. at 131-32.

Noting that the standard of review "obligates" the Court to view the allegations "generously" in a plaintiff's favor, the Fourth Circuit held that these facts *were* sufficient to plausibly plead protected activity. <u>Id</u>. at 133. The Court reasoned that whilst the allegations "may well be insufficient" to prove fraud under the FCA's Rule 9(b) pleading standard, the SAC made only an FCA retaliation claim, which was subject to the "relatively low" Rule 8(a) pleading standard. <u>Id</u>.

at 134. Since Congress broadened the scope of protected activity, the Youngs sufficiently pleaded that they engaged in "other efforts" to investigate or stop what they believed was fraud.

### i.      Dr. Oldham complains on "multiple occasions" and at "staff meetings"

Here, Dr. Oldham's Amended Complaint (AC) more than sufficiently alleges that Dr. Oldham engaged in protected activity. Like the plaintiffs in <u>Grant</u> and in <u>Young</u> who complained on "multiple occasions," Dr. Oldham similarly complained on multiple occasions. Just as Plaintiff Grant complained "in person and in writing" to United managers about United's failure to use proper tools, so too did Dr. Oldham complain, in person and in writing, to Centra and its management (including E.W. Tibbs) about Centra's improper use of screening ultrasounds and mammograms. Specifically, the AC alleges that Dr. Oldham "raised concerns regarding the use of screening ultrasound in August 2016," and even attaches Exhibit 4, showing that "Dr. Perroto acknowledged Centra's use of screening ultrasound." AC ¶ 50.

Like the Youngs who "expressed concern" about CHS's use of expired medicine to "supervisors" and at "staff meetings," so too did Dr. Oldham "raise concerns with the number of breast MRIs being ordered" at weekly meetings and directly with management. AC ¶ ¶ 65-67. Much like Mrs. Young who called CHS's practices "totally misleading," Dr. Oldham called Centra's practices "wasteful." AC ¶ 66. Just as Mr. Young complained that CHS was listing emergency medical technicians for surgery even though they had no surgical experience, so too did Dr. Oldham complain that Centra's radiologists were routinely ordering MRIs despite being *interpreting* physicians, not treating ones. AC ¶ 57. These practices were particularly relevant to Medicare billing because Centra was a participant in Medicare's Oncology Care Model (OCM) and these practices rendered Centra ineligible for payments under the PBP program. AC ¶ 68.

### ii.     Dr. Oldham escalates his investigative and whistleblowing activities

Moreover, the AC specifically alleges that after noticing Centra's "unusually high number of diagnostic breast imaging studies" (AC ¶ 69), Dr. Oldham escalated his investigative and whistleblowing activities—much like Grant and the Youngs did—by "creat[ing] a meeting that he called the 'Oncology Service Line Meeting.'" The purpose of this new meeting was to reduce medically "unnecessary utilization in breast imaging." AC ¶ 71-74 (alleging minute details from two such meetings). Centra subsequently "cancelled" these meetings until Dr. Oldham could be replaced as medical director. AC ¶ 75.

### iii.     Boycott and meeting with E.W. Tibbs

Finally, the AC specifically alleges that Dr. Oldham attempted to lead an "organized effort to boycott" the signing of the pre-authorization breast imaging forms.  AC ¶ 76. The AC further alleges that Dr. Oldham met with E.W. Tibbs, the former CEO of Centra, to voice his complaints. Like Mr. Young who told the "director of internal operations" that he believed CHS was improperly using expired medicine, Dr. Oldham told E.W. Tibbs that he believed Centra was improperly using screening ultrasounds and imaging. This made Centra ineligible for Medicare's OCM payment program. AC ¶ 77. The AC also specifically alleges that Tibbs "assured Dr. Oldham" that "he [Tibbs] would take corrective action." Id.

### iv.     Dr. Oldham is observed preparing a complaint, just two business days before being banished from Centra's facilities

Just like Plaintiff Grant who was observed investigating and taking pictures of what he believed was defective equipment, after which he was "immediately escorted out of the building," so too was Dr. Oldham observed preparing complaints, after which he too was almost immediately banished from the building. AC  ¶ 84-86. Specifically, the AC alleges that: Katie Kirby, the Director of Practice Operations, observed Dr. Oldham at his office on Friday, November 23, 2017; that Dr. Oldham complained to Kirby about Centra's "continuing a pattern of overutilization;" and

that "he was preparing complaints" as a result thereof. Id.  Much like the Youngs, who were terminated just two days following the escalation of their complaints, Centra banned Dr. Oldham from "setting foot at any Centra facilities" just two business days later—on November 28, 2017. Finally, just as Plaintiff Grant wrote an email to the Managing Director accusing the company of defrauding the U.S. government, so too did Dr. Oldham write an email to the Chair of the Centra Board of Directors, Walker Sydnor, accusing Centra of "illegal billing activities." AC ¶ 88.

In sum, just as the Fourth Circuit held that the plaintiffs' allegations in Grant and in Young were sufficient to permit a trier of fact to find that the plaintiffs engaged in **"efforts to stop"** possible fraud (even if such acts were not in furtherance of a qui tam action), so too must this Court—on strikingly similar facts—find that the allegations here are also sufficient to plausibly plead that Dr. Oldham engaged in "efforts to stop" possible fraud at Centra.

> **v.     Purported statistical inaccuracies *later* discovered in the reports upon which Dr. Oldham relied are irrelevant to the retaliation inquiry; the Fourth Circuit measures reasonable belief based on the facts available at the time**

That the 2016 and 2017 CMS Hospital Compare Reports were later discovered to contain inaccuracies does not diminish Dr. Oldham's objectively reasonable belief that Centra was engaged in possible fraud. Objective reasonableness is measured based on the facts available to the plaintiff at the time he undertakes the efforts in question. The Court asks whether the plaintiff had a reasonable belief that his employer was engaged in possible fraud, or might soon be engaged in fraud, and whether the plaintiff engaged in "other efforts" to collect information, investigate, or put an end to the practice in question. See Grant, 912 F.3d at 201-03; see also United States ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc., 865 F.3d 71, 98 n.34 (2d Cir. 2017) ("[Section] 3730(h) does not protect only efforts to prompt an investigation or change a

company's general principles; it protects an effort to prevent *even one* violation of the False Claims Act.") (emphasis added).

Accordingly, the AC sufficiently alleges that Dr. Oldham was engaged in protected activity. Under the Fourth Circuit's expanded universe of protected activity, any one of the aforementioned investigative and whistleblowing efforts undertaken by Dr. Oldham could suffice to constitute "other efforts" to investigate or stop possible fraud. The totality of facts is more than sufficient to plausibly plead protected activity under Rule 8(a).

## 2. Centra was "on notice" that Dr. Oldham was engaged in protected activity

The notice element under 31 U.S.C. § 3730(h) does *not* require actual notice of an FCA action. Smith, 796 F.3d at 433 ("It strains credulity to believe that Congress would require a defendant to have knowledge of a sealed action for a retaliation claim to survive the pleading stage."). When the first element—the scope of protected activity—was expanded by Congress in 2009 and 2010 to include "other efforts" (such as collecting data even before the plaintiff puts together all the pieces of the puzzle) so too was the second element—notice—also expanded. Id. at 434 & n.6 (explaining that the amendment expanded the boundaries of what constitutes notice of protected activity); United States ex rel. Reed v. KeyPoint Government Solutions, 923 F.3d 729, 766 (10th Cir. 2019) ("Once Congress expanded the scope of protected activity, the universe of conduct that a plaintiff could allege to show notice also necessarily expanded.").

Here, much like the Second Amended Complaints ("SACs") in Grant and in Young, the AC pleads ample facts that plausibly show Centra was on notice. From writing an email to Dr. Perroto to complaining at weekly staff meetings to creating the new Oncology Service Line meetings, Dr. Oldham went above and beyond to notify Centra that he believed its practices were medically unnecessary and fraudulent. Not only did Dr. Oldham attempt to organize a "boycott" of such

practices, but also complained directly to management. Dr. Oldham met with E.W. Tibbs, Centra's CEO, who told him he [Tibbs] would take "corrective action." AC ¶ 77. Moreover, just two business days prior to being banished from the building, Dr. Oldham was observed preparing complaints against Centra and its management. Dr. Oldham even told the Director of his imminent intent to file a complaint. Lastly, Dr. Oldham wrote an email about Centra's illegal billing activities to the Chair of the Centra Board of Directors. AC ¶¶ 50-88.

Centra conceding in briefing that it actually tried to make changes in response to some of Dr. Oldham's complaints[2] only serves to bolster the notice element. As the Fourth Circuit explained in Grant, the fact that a plaintiff's complaints might "trigger an [internal] investigation" by a defendant actually furthers a plaintiff's retaliation claim because it proves that the defendant had knowledge of the protected activity. Grant, 912 F.3d at 203 ("Grant complained to United management on numerous occasions in person and in writing about the company's allegedly fraudulent conduct. At least some of his complaints triggered an investigation into whether 'the machine shop was operating faulty equipment and failing to train employees.' This suffices to satisfy the knowledge prong.").

### 3. Centra took a materially adverse employment action against Dr. Oldham

"An employer undertakes a materially adverse action opening it to retaliation liability if it does something that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Grant, 912 F.3d at 203 (quoting Smith, 796 F.3d at 434). A plaintiff's termination "following close on the heels of his numerous complaints" represents the "ultimate action an employer can take" against a reasonable worker for engaging in protected activity. Id.

---

[2] See, e.g., ECF Doc. 29 at 5 ("Dr. Oldham made suggestions and Centra implemented certain of them.").

As the Fourth Circuit explained in <u>Complin</u>, "**close temporal proximity**" between protected activity and the plaintiff's termination satisfies the third element.   <u>United States *ex rel*. Complin v. North Carolina Baptist Hospital,</u> 818 Fed. Appx. 179, 185 (4th Cir. 2020) ("In the absence of direct evidence of causation, close temporal proximity between protected activity (or an employer's knowledge of protected activity) and an adverse employment action may give rise to an inference of causation."). Unlike in <u>Complin</u>, where there was no temporal proximity because over two years had passed, the close timing of events here strongly supports a reasonable inference of causation. Just as Plaintiff Grant complained to management on multiple occasions, was finally observed taking pictures, and then almost immediately escorted out of the building and terminated shortly thereafter, so too did Dr. Oldham complain on multiple occasions, was observed preparing a formal complaint on November 23, 2017, and then almost immediately banished from the building on November 28, 2017 (just two *business* days later). Being banished from the workplace is a materially adverse employment action that would dissuade any reasonable worker from making a charge against his employer. *See* <u>Grant</u>, 912 F.3d at 195, 203 (close proximity in timeline of events supported a reasonable inference that employee was fired in retaliation for engaging in protected activity); *see also* <u>Sec'y of Labor v. Mut. Mining, Inc</u>., 80 F.3d 110, 112 (4th Cir. 1996) (holding that the timing of layoffs supported a finding of retaliation). As it did in <u>Young</u> and in <u>Grant</u>, the close timing of events alleged here also supports a reasonable inference that Centra fired Dr. Oldham because he engaged in protected activity.

4.   **<u>Branscome</u> predates the Fourth Circuit's decision in <u>Grant</u> and is inapposite**

Defendant Centra's reliance on <u>United States *ex rel*. Branscome v. Blue Ridge Home Health Services, Inc.</u> is misplaced. <u>Branscome</u> *predates* the Fourth Circuit's controlling decision in <u>Grant</u>. Whilst <u>Branscome</u> might have been "instructive" at the time it was issued by the Western District

in March of 2018, the Fourth Circuit's decision in <u>Grant</u> was decided on December 26, 2018, after <u>Branscome</u>, and is binding precedent.

In any event, <u>Branscome</u> is easily distinguishable: the plaintiff in <u>Branscome</u> merely alleged that she raised general questions and had conversations about Medicare fraud "with patients," i.e., Branscome alleged that she ***asked a patient*** about a co-worker and ***told the patient*** that she was going to report her co-worker for not performing the requisite physical therapy. <u>United States ex rel. Branscome v. Blue Ridge Home Health Services, Inc.,</u> 2018 WL 1309734 (W.D. Va. March 13, 2018). The Court held that these "conversations" did not sufficiently allege protected activity. By contrast, Dr. Oldham did not allege discussing complaints with *patients,* but with Defendant Centra. Dr. Oldham's AC—like the SACs in <u>Grant</u> and in <u>Young</u>—alleges specific complaints, made in person and in writing, to Centra's management. Dr. Oldham's AC also shows firsthand knowledge of specific medical and billing practices he believed were fraudulent (i.e., lack of CPT code for screening ultrasounds, breast MRIs without orders from a treating physician, etc.). As the medical director of oncology, Dr. Oldham had access to specific details relating to Centra's ultrasound and MRI practices, including Centra's ineligibility for PBP payments under Medicare's OCM. This type of firsthand knowledge—as well as the specifically alleged instances of protected activity, i.e., complaining directly to Tibbs, being observed preparing a formal complaint, telling a Director he was about to file a complaint only two business days before being banished from the building—is a high level of specificity that was glaringly absent from <u>Branscome</u>. Thus, <u>Branscome</u> is inapposite. The retaliation facts in the case at bar are far more similar—and almost identical—to the facts in <u>Grant</u> and in <u>Young</u>, both binding precedent from the Fourth Circuit.

**5. The FCA's anti-retaliation whistleblower protections were expanded to cover non-employees such as contractors or agents**

Dr. Oldham need not be an "employee" of Centra to have whistleblower protection under the FCA's anti-retaliation provision. Indeed, Congress's 2009 Amendment expressly "expanded the universe of individuals who could sue under the FCA's retaliation provision from an 'employee' to an 'employee, contractor, or agent' and eliminated the reference to 'employer.'" Irving v. PAE Government Services, Inc., 249 F.Supp.3d 826, 830-31 (E.D. Va. April 11, 2017). In so doing, Congress "meant to recognize the fact that agents and contractors, which were added to the class of potential plaintiffs in 2009, are not entities controlled or directed by an employer." Id. at 831. Since the federal government found it increasingly necessarily to rely on "independent contractors, who in turn, often hired subcontractors and agents to perform necessary government tasks," Congress expanded the whistleblower protections to ensure that "all individuals"—even those who were not parties to the contract—who witnessed fraud against the government could bring FCA claims and be protected from retaliation. Id. at 832.

**6. The VFATA retaliation claim also suffices to satisfy the same three prongs**

Similar to the FCA, to state a claim for retaliation under Code § 8.01-216.8 of the VFATA, a plaintiff must allege the same three prongs as required for the FCA retaliation claim: (1) that he or she engaged in a protected activity; (2) that the employer knew about these acts; and (3) that the employer took adverse action against him or her as a result. United States v. Ndutime Youth & Family Servies, Inc., 2020 WL 5507217 *20 (E.D. Va. September 11, 2020). Like the FCA, the VFATA also broadened the meaning of protected activity to include either (1) acts in furtherance of an action under the VFATA, **or** (2) "other efforts" to stop one or more VFATA violations. Id. The relief provided in the VFATA is "identical" to the relief in the FCA. Id. A VFATA retaliation claim need only meet Rule 8(a) to survive a motion to dismiss. Id. Here, therefore, just as the AC sufficiently alleges facts that plausibly plead the three prongs of a retaliation claim under the FCA,

so too does the AC sufficiently plead a retaliation claim under the VFATA for the same reasons articulated above and incorporated herein by reference.

**B.  Breach of Contract.**

The AC sufficiently alleges facts that plausibly plead that Dr. Oldham is an intended third-party beneficiary of the contract between Centra and LHOC. In Virginia, it is "well-established" that "under certain circumstances, a party may sue to enforce the terms of a contract even though he is not a party to the contract." Levine v. Selective Ins. Co. of America, 250 Va. 282, 285 (1995). This rule was codified in Va. Code § 55–22. Virginia courts enforce third-party beneficiary claims when the third party "show[s] that the parties to the contract clearly and definitely intended it [the contract] to confer a benefit upon him." Id. at 286. The third party, in other words, must have been an intended beneficiary, not merely incidental.

**1.  The Virginia Supreme Court looks beyond the "express" language of the contract and considers the "surrounding circumstances" when determining third party beneficiary status**

To qualify as an "intended beneficiary," the third party need not be "expressly" named in the contract. Instead, the Supreme Court of Virginia looks beyond the four corners of the contract to the "surrounding circumstances." Tingler v. Graystone Homes, Inc., 298 Va. 63, 104 (2019) ("While a contract may expressly state such an intent to benefit a third party, evidence of such intent ***need not be limited to the four corners of the contract***") (citing Levine, 250 Va. at 284) (finding it sufficient that "all parties expressly understood that the beneficiaries of [the contract] were the [plaintiffs]" even though the plaintiffs were not expressly named therein) (emphasis added). The Supreme Court of Virginia further noted that, "[I]n most jurisdictions, the intent to benefit a third party can be shown not only by the contract's express language but also by ***surrounding circumstances***, and ***many modes of expression of intent*** are accepted by the courts."

Tingler, 298 Va. at 269 (citing 13 Williston & Lord n. 11, § 37:10, at 101-02 (4th ed. 2013))
(emphasis added) (internal quotations omitted); *see* Restatement (Second) of Contracts § 302(1)
(1981)). Lastly, the status of an intended third-party beneficiary does not depend upon permanent
membership in the class of intended beneficiaries. Ogunde v. Prison Health Servs., 274 Va. 55, 64
(2007).

### 2. Both the contract and the surrounding circumstances show that Dr. Oldham is an intended third-party beneficiary of the contract

Applying these principles here, both the express language of the contract and the surrounding
circumstances demonstrate that the AC sufficiently alleges facts that plausibly plead that Dr.
Oldham was not just an incidental beneficiary, but an intended one. ***First***, Count III expressly
"incorporates" all the foregoing facts laid out in the AC as if "fully set forth in Count III." AC
Count III at ¶ VII. ***Second***, those alleged facts set forth specific circumstances surrounding the
merger of the two entities—Centra and LHOC—which shed light on the intended purpose of the
contract. Specifically, the AC alleges that Dr. Oldham initially worked with LHOC prior to its
merger with Centra. AC ¶ 24. After the merger, the staff of LHOC became employees of Centra
while the physicians, such as Dr. Oldham, "remained contractors with Centra under a professional
services agreement ("PSA")." AC ¶ 25. The AC further alleges that, under the PSA, physicians
were paid incentive compensation based on productivity, and Centra also separately paid
physicians for serving as "medical director." The AC specifically alleges that Dr. Oldham was, in
fact, a medical director from 2014 until June 2017. AC ¶ 28-29. The AC therefore alleges
numerous specific facts that plausibly plead that the contract was entered into with the specific
purpose of retaining LHOC physicians such as Dr. Oldham, i.e., by expressly providing rights and
benefits to them such as incentive compensation and pay for medical directors. ***Third***, the AC
specifically alleges that Centra breached a provision of the PSA that expressly requires Centra to

provide notice of a physician's breach of duty and allow <u>the physician 30 days to cure</u> such breach. AC ¶ 30 (citing section 8 of the PSA, which expressly states that ". . .in the event Centra claims that a breach of this section by a physician has occurred, Centra shall so notify the group in writing of the alleged breach and **<u>such breaching physician shall have 30 days</u>** after notice **to cure** such breach. If said breach is not cured within 30 days after such notice, Centra may remove . . ." the physician) (emphasis added). ***Fourth***, section 18 of the PSA does not, as Centra purports, expressly "exclude" Dr. Oldham from third-party beneficiary status; it merely prevents each entity from re-assigning its *own* rights and obligations to another entity. A restriction on an entity's *own* rights does not extinguish the "express language" or "surrounding circumstances" that plainly show an intent to confer separate—and specifically identifiable—contract rights and benefits to third parties. As a party to the contract, Centra was well aware that Dr. Oldham was a physician in the class of physicians for whose benefit section 8's notice provision was intended.

The plain language of the text, along with the surrounding circumstances of the merger, show that the contracting parties—Centra and LHOC—"clearly and definitely" intended the contract to confer rights and benefits upon Dr. Oldham.  Although the Supreme Court looks to all of the facts and circumstances in its analysis of third-party beneficiary status, if this Court finds that Count III of the AC ought to have included the word "intended" before the phrase "third party beneficiary," the Plaintiff respectfully requests leave to amend.

## CONCLUSION

For the foregoing reasons, this Court should find that the AC alleges sufficient facts to *plausibly* plead claims of (1) retaliation under the FCA and VFATA, and (2) breach of contract. Accordingly, the Court should deny Defendant Centra's Motion to Dismiss all counts.

Respectfully submitted,

DWIGHT OLDHAM


By:   ***John R. Thomas, Jr.***
       Of Counsel

John R. Thomas, Jr. (VSB No. 75510)
Christopher C. Newton (VSB No. 77135)
Mia Yugo (VSB No. 92975)
HAFEMANN, MAGEE & THOMAS
11 Franklin Rd., STE 200 Roanoke, Virginia 24011 (Street)
P.O. Box 8877, Roanoke, Virginia 24014 (Mailing)
Phone: 540-759-1660
Fax:    921/221-4441
Email: jt@fed-lit.com
          chris@fed-lit.com
          mia@fed-lit.com

*Counsel for Dr. Oldham*