CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
7/12/2021
JULIA C. DUDLEY, CLERK
BY: s/ A. Little
      DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA & THE COMMONWEALTH OF VIRGINIA, *ex. rel.* DWIGHT OLDHAM,<br><br>                      *Plaintiff*,<br><br>v.<br><br>CENTRA HEALTH, INC.,<br><br>                      *Defendant*. | CASE NO. 6:18-cv-00088<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

In late 2017, Centra Health, Inc. banned Dr. Oldham, an experienced physician who worked at the Lynchburg Hematology Oncology Clinic, from its premises. Dr. Oldham brought this suit against Centra, alleging that Centra retaliated against him because he investigated the organization's unusually high utilization rates for several forms of oncology testing. Specifically, Dr. Oldham contends that Centra (1) violated the anti-retaliation provisions of the False Claims Act and the Virginia Fraud Against Taxpayers Act, and (2) committed common law breach of contract. Centra filed a motion to dismiss Dr. Oldham's amended complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons discussed, the Court will grant Centra's motion in part and deny it in part.

## I.   FACTUAL ALLEGATIONS

A.  Centra's Merger with the Oncology Clinic

Dr. Oldham worked at the Lynchburg Hematology Oncology Clinic ("LHOC") for several decades prior to its merger with Centra in 2014. Dkt. 19 ¶ 24. After the merger, he worked under a professional services agreement ("PSA") that became effective on September 1, 2014. *Id.* ¶¶ 25–26. At the time of LHOC's merger, Dr. Oldham was the medical director of LHOC, a role which he held until Centra split the position in two in June 2017. *Id.* ¶ 29. Following the split, Dr. Oldham was responsible for supervising the implementation of the Oncology Care Model ("OCM") outlined in the Affordable Care Act. *Id.* ¶ 64.

B.  Improper Pre-Authorization Forms and Circumvention of Physician-Ordered Imaging

The Medicare Benefit Policy Manual outlines the proper parameters for diagnostic imaging and testing in Chapter 15 Section 80. *Id.* ¶ 35. More specifically, Sections 80.6.1 to 80.6.4 cover the appropriate ordering of follow-up diagnostic imaging studies. *Id.* ¶¶ 35, 38. CMS updated Section 80 to stop the routine ordering of follow-up testing by radiologist-interpreting physicians because of the unnecessary testing that resulted. *Id.* ¶ 37.

Centra uses nurses, known as "breast navigators," who are assigned to each patient to assist them through the course of breast cancer treatment. *Id.* ¶ 34. Dr. Oldham alleges that breast navigators control the referrals of new patients and Centra "used their control of the referral process to exclude certain physicians from seeing breast cancer patients . . . [and to] intimidate[] physicians who participated in the breast program into tolerating overutilization of imaging by Centra." *Id.* ¶ 34.

This was done, in part, through Centra Breast Imaging's "Mammography Appointment Request Form," used at all Centra Breast Imaging locations. *Id.* ¶ 33. Completed forms are sent

to the ordering physician for a signature and each form includes a section with a pre-checked box with the statement, "Any diagnostic breast exam procedure deemed necessary." *Id.* Centra's form is not specific, and it allows the radiologist at Centra Breast Imaging (an interpreting physician), not the treating physician, to choose what diagnostic imaging and testing should occur—in violation of the Medicare Benefit Policy Manual. *Id.* ¶ 38.

    C. <u>Inappropriate Use of Breast Ultrasounds and Breast MRIs</u>

National Coverage Determination 220.4 contains the Medicare policy for screening mammography, covering assisted detection and screening digital breast tomosynthesis. *Id.* ¶ 40. Screening services do not require an ordering physician. *Id.* There is also an exception that allows an interpreting physician to order a diagnostic mammogram with an abnormal screening study, pursuant to 42 C.F.R. 410.32. *Id.* Medicare does not recognize a screening breast ultrasound. *Id.* ¶ 41. Moreover, the National Cancer Center Network, a group that develops guidelines for appropriate cancer drug therapy, specifically recommends against the routine use of breast ultrasound for screening women with dense breasts due to high number of false positive tests leading to unnecessary breast biopsies. *See* Dkt. 19-3. However, Dr. Oldham alleges that Centra routinely used diagnostic breast ultrasounds to screen women with increased breast density in an inappropriate manner as a means to follow-up on specifically identified abnormalities. Dkt. 19 ¶¶ 47–48.

Dr. Oldham raised concerns about the use of screening ultrasounds in August 2016, and another physician, Dr. Perroto, acknowledged Centra's use of screening ultrasound in an August 14, 2016 email. Dkt. 19-4 at 2. Additionally, published CMS data for 2016 and 2017 showed Centra's utilization of ultrasound and MRI, after a screening mammography, to be significantly

higher than the national average.[1] Dkt. 19 ¶ 51.

In addition to the allegedly improper and excessive use of breast ultrasounds, Dr. Oldham alleges that Centra misused breast MRIs. Neither the National Cancer Center Network guidelines nor the American College of Breast Surgeons' guidelines recommend the routine use of breast MRIs prior to surgery. *Id.* ¶ 54. Nonetheless, Centra radiologists, without an order by the treating physician, routinely ordered breast MRIs. *Id.* ¶ 57. In 2016, Centra's use of breast MRIs after a cancer diagnosis was 74%—over twice the national average. *Id.* ¶ 58.

During Dr. Oldham's tenure as the medical director, he participated in a weekly Breast Conference, attended by medical oncology, radiation oncology, surgery, breast navigators, pathology, breast imaging, and mammography. *Id.* ¶ 65. During those meetings, he raised concerns about the number of MRIs being ordered. *Id.* ¶ 66. He also objected to individual patients receiving a breast MRI in instances where it would be wasteful and unhelpful. *Id.*

D.  Centra's Participation in the Oncology Care Model ("OCM)

At Dr. Oldham's request, Centra agreed to participate in the OCM model in 2015—a Medicare Advanced Payment Model. *Id.* ¶ 67. Part 1 of the OCM provides participating organizations with a monthly payment of $160 per patient per month to invest in quality improvements. *Id.* ¶ 68. The goal of Part 1 is to ensure that participants take certain quality care measures. *Id.* Part 2 of the OCM requires organizations to demonstrate cost savings as a result of quality improvement activities. *Id.* Groups that show cost savings become eligible for additional performance-based payment. *Id.*

In assessing costs for the OCM, Dr. Oldham identified an unusually high number of

---

[1] The amended complaint notes that there is "a possibility" that this report contained "inaccuracies," but that "Dr. Oldham had no reason to doubt the accuracy" of the report when he made "a good faith effort to implement the Oncology Care Model." Dkt. 19 ¶ 52.

diagnostic breast imaging studies. *Id.* ¶ 69. He subsequently held two meetings—the "Oncology Service Line" meetings—to develop a plan to make Centra eligible for performance-based payment under the OCM Part 2. *Id.* ¶ 71. This included efforts to reduce unnecessary utilization of breast imaging. *Id.* Dr. Oldham successfully held two "Oncology Service Line" meetings in the fall of 2016 before Centra cancelled subsequent meetings. *Id.* ¶ 75. Even so, Dr. Oldham later organized an effort to boycott the signing of pre-authorization requisition forms that Centra Breast Imaging provided, which had the preselected option of unlimited additional testing. *Id.* ¶ 76.

    E.  <u>Centra's Response to Dr. Oldham's Actions and Continued OCM-Related Issues</u>

In the fall of 2016, Dr. Oldham met with E.W. Tibbs, the former CEO of Centra Health, to discuss OCM. *Id.* ¶ 77. Tibbs assured Dr. Oldham at the meeting "that he would take corrective action" as to the lack of progress in meeting financial targets under the model. *Id.*

After the meeting, Dr. Oldham alleges, upon information and belief, that Tibbs took the following steps: (1) promoted Curt Baker (Vice President of Oncology) to Chief Nursing Officer; (2) demanded Dr. Oldham be removed as Medical Director for Medical Oncology as part of LHOC's contract negotiation for renewal of its PSA with Centra;[2] and (3) failed to make changes at Centra Breast Imaging or take action as to Carol Riggins (Managing Director of Pearson Cancer Center). *Id.* ¶ 78. Baker and Riggins were the two administrators responsible for the breast navigators and Centra Breast Imaging. *Id.* ¶¶ 72–73.

Approximately a year later, in August 2017, Riggins filed a complaint against Dr. Oldham for disruptive behavior with Centra Human Resources. *Id.* ¶ 79. Dr. Oldham met with a subcommittee of the Centra Medical Staff Executive Committee ("MEC"), at which time Dr.

---

[2] The parties renewed the PSA in June of 2017 and Dr. Oldham gave up Medical Director duties, except those specifically related to the OCM.

Oldham agreed that he had made unkind remarks about Riggins outside her presence. *Id.* ¶ 80. He received a letter of reprimand from the MEC, but did not respond to it. *Id.* ¶ 81.

In November of 2017, Dr. Oldham reviewed the preliminary financial data for the OCM and found that Centra was not eligible for any performance-based payment. *Id.* ¶ 83. Yet, Centra continued to participate in the OCM and collect Part 1 payments, despite improperly utilizing imaging and other services. *Id.*

Later that month, on November 23, the Centra Medical Oncology Office was closed for patient care. *Id.* ¶ 84. Dr. Oldham went to the office and reviewed files and old emails because he planned on filing "complaints" related to "the Oncology Service Line Meetings and over-utilization of breast imaging" with the "Centra Board of Directors, The Joint Commission on Accreditation of Hospitals, and Medicare." *Id.* Katie Kirby, the Director of Practice Operations for LHOC, was also in the office that day and spoke with Dr. Oldham. *Id.* ¶ 85. Dr. Oldham told her that he was "preparing complaints" that "he hoped it would lead to the replacement of Mr. Tibbs, Mr. Baker, and Ms. Riggins." *Id.*

Two business days later, on November 28, Centra banned Dr. Oldham from its facilities. *Id.* ¶ 86. Centra's Vice President for Human Resources and Chief Operating Officer stated that the reason for the ban was "threatening behavior." *Id.* Dr. Oldham alleges that the reason is pretextual and the true reason for his ban is because he intended to report Centra's fraudulent activities. *Id.* ¶ 87. A week after he was banned, on December 5, Dr. Oldham communicated his concerns about Centra's illegal billing activities to the Chair of Centra's Board of Directors. *Id.* ¶ 88.

## II.     PROCEDURAL HISTORY

Dr. Oldham filed his original qui tam complaint against Centra on November 21, 2018. Dkt. 1. The complaint alleged violations of the False Claims Act ("FCA") and Virginia Fraud Against Taxpayers Act ("VFATA"), based on anomalous breast imaging statistics. On January 29, 2020, the United States and the Commonwealth of Virginia filed Notices of Election to Decline Intervention. Dkts. 9, 10. Following the declination notice, Dr. Oldham filed and an amended complaint. Dkt. 19.

## III.     STANDARD OF REVIEW

Defendants move to dismiss the action for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of a complaint to determine whether a plaintiff has properly stated a claim; it "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). To survive a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff's "'factual allegations must be enough to raise a right to relief above the speculative level,' thereby 'nudging [his] claims across the line from conceivable to plausible.'" *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 391 (4th Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The Court must take all facts and reasonable inferences in favor of the plaintiff, disregard any legal conclusions, and not credit any formulaic recitations of the elements. *See Iqbal v. Ashcroft*, 556 U.S. 662, 678 (2009); *Twombly*, 550 U.S. at 555, 557.

It is well-established that an FCA retaliation claim does not require a showing of fraud. *See United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 200 (4th Cir. 2018) ("Unlike [] substantive FCA claims, retaliation claims under § 3730(h) are not subject to Rule

9(b)'s heightened particularity requirement. Instead, a plaintiff need only satisfy Rule 8(a)'s notice-pleading standard."); *Young v. CHS Middle East, LLC*, 611 F. App'x. 130, 134 (4th Cir. 2015).

## IV. DISCUSSION

### A. *The FCA and the VFATA Claims*

Dr. Oldham alleges retaliation against Centra under the FCA and the VFATA. To state a retaliation claim under the FCA or the VFATA, Dr. Oldham must allege facts which support a reasonable inference that: (1) he engaged in a protected activity; (2) Centra knew of the protected activity; and (3) that Centra took adverse action against him in response. *Grant*, 912 F.3d at 200.[3]

#### 1. *Protected Activity*

To constitute protected activity, an act must be motivated by an objectively reasonable belief that the employer is violating or will soon violate the FCA, that the employee took action to stop the FCA violations, and that the employee has a nexus to the FCA violation. *Id.* at 201–02. The Fourth Circuit recognizes two types of protected activity—acts "in furtherance of an FCA action," and "other efforts to stop 1 or more [violations]." *Id.* at 200.

"A belief is objectively reasonable when the plaintiff alleges facts sufficient to show that he believed his employer was violating the FCA, that this belief was reasonable, that he took action based on that belief, and that his actions were designed to stop one or more violations of

---

[3] The requirements for establishing a retaliation claim under the VFATA are identical to those under the FCA. *Atchariyakornchai v. Frederick Cty. Sanitation Auth.*, No. 5:18-cv-00036, 2018 WL 4714859, at *3 (W.D. Va. Sept. 30, 2018) (internal citations omitted). The two types of protected activities are also identical. *Id.* (citing *Chapins v. Nw. Cmty. Servs. Bd.*, 243 F. Supp. 3d 739, 745 (W.D. Va. 2017)).

the FCA." *Id.* at 201–02. These acts need only have a nexus to the FCA; they "need not lead to a viable FCA action." *Id.*; *see Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 434 (4th Cir. 2015) (defining the scope of protected activity under the FCA to "plainly encompass[] more than just activities undertaken in furtherance of a False Claims Act lawsuit.").

Centra contends that the main deficiency with Dr. Oldham's complaint is that he never reported anything about FCA violations before he was banned from their premises. They assert that Centra only learned about allegations of "illegal billing activity" for the first time on December 5, 2017, a week after Dr. Oldham was banned from Centra facilities. Centra further claims that Dr. Oldham's only assertion of *any* protected activity while employed is that he made a statement to Kirby saying that "Centra was continuing a pattern of over-utilization and refusing to implement clinical pathways or effective case management procedures" and that he was preparing unspecified "complaints" which he hoped "would lead to the replacement of Mr. Tibbs, Mr. Baker, and Ms. Riggins." Dkt. 19 ¶ 85.

Considering the complaint in its totality, the Court finds that Dr. Oldham sufficiently alleges that he engaged in protected activity. Like the Fourth Circuit found in *Grant*, the scope of protected activity under the FCA should be interpreted broadly. 912 F.3d at 201. And here, Dr. Oldham's overall course of conduct alleges an ongoing concern about fraudulent activity on the part of Centra.

Indeed, in *Grant*, the court found that the plaintiff engaged in protected activity where the employee: (1) attended meetings where he discussed each example of misconduct he had identified, (2) alerted the company's managing director of maintenance about potential fraud, and (3) took photographs of missing, but required equipment. *Grant*, 912 F.3d at 195.

Like the plaintiff in *Grant*, Dr. Oldham repeatedly made complaints about fraudulent

activity and took steps to investigate the misconduct. For example, he pressed other physicians about the differences between Centra's use of breast imaging compared to the national average and sought to eliminate "a large portion of unnecessary testing." Dkt. 19-5 at 3 (noting that Centra was using MRIs to track "breast cancer diagnosis at a rate of 37.9% compared to the national average of 8.9%"). Dr. Oldham also made efforts, through the Oncology Service Line meetings, to reduce unnecessary utilization of breast imaging in order to gain eligibility under OCM Part 2. Centra eventually cancelled those meetings and Dr. Oldham alleges that "Centra was planning to participate in OCM [and] collect [Part 1] payments while continuing to over utilize imaging and other services" and that doing so "maximized revenue to Centra," despite no intention to minimize unnecessary MRIs. Dkt. 19 ¶ 83; *see also* Dkt. 19-5 at 4 (highlighting the increased profitability of the oncology service line, at least in part due to an "increase in volume and billing"). The concern for Dr. Oldham was that Centra was ordering substantial amounts of MRIs that were "unnecessary," "wasteful," and "unhelpful" for many patients—including ordering breast MRIs when patients may have "already elected to have a mastectomy or before they had seen a surgeon." Dkt. 19 ¶ 66; Dkt. 19-5 at 3.

Indeed, he even met with Centra's former CEO, where he discussed "breast imaging and Centra's lack of progress in meeting financial targets in OCM." Dkt. 19 ¶ 77. Yet, Centra made no efforts to quell its overutilization of breast imaging. Eventually Dr. Oldham told a co-worker that he was preparing to file complaints against Mr. Tibbs, Mr. Baker, and Ms. Riggins with the "Centra Board of Directors, The Joint Commission on Accreditation of Hospitals, and Medicare." *Id.* ¶ 85.

Ultimately, over the course of 5 years, Dr. Oldham repeatedly made statements to other physicians and supervisors and took action addressing his view that Centra was inappropriately

overutilizing breast imaging. The complaint contains enough factual allegations to make an inference that Dr. Oldham reasonably believed Centra was violating the FCA, and that he took steps to investigate and stop the violations. *See United States v. Fam. Med. Ctrs. of S.C., LLC*, C/A No. 3:14-382-MBS, 2016 WL 6601017, at *3 (D.S.C. Nov. 8, 2016) ("For the purposes of a motion to dismiss, the court cannot say that allegedly routine testing made without reference to the patient's needs or a physician's request constitutes a difference of opinion so as not to state a claim under the FCA.").

### 2. Centra's Knowledge of Protected Activity

"Since, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the [knowledge] element of the prima facie case." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1988). However, under the FCA, actual notice of a plaintiff's protected activity is not required. *Smith*, 796 F.3d at 433.

Dr. Oldham alleges that he informed relevant stakeholders about the overuse of imaging, including raising the issue with other physicians, Dr. Perroto, and during the Service Line meetings. Dkt. 19 ¶¶ 50, 66, 76; Dkt. 19-5 at 3. Dr. Oldham even shared his concerns about overutilization with Centra's former CEO and with Kirby, the Director of Practice Operations for LHOC. *Id.* ¶ 77, 84. Centra argues that Dr. Oldham failed to allege that the two individuals who actually notified him that he was banned, Karen Ackerman (Centra's Vice President of Human Resources) and Michael Elliott (Centra's Chief Operating Officer), did not know about the protected activity and fired him for non-retaliatory reasons.

Centra contends that the reason Ackerman and Elliott fired Dr. Oldham was because he engaged in disruptive behavior. It is true that Riggins filed a complaint against Dr. Oldham for

disruptive behavior in August 2017 and that Dr. Oldham met with Centra's MEC and "agreed that he had made unkind remarks about Riggins outside her presence." Dkt. 19 ¶¶ 79–80. But that disruption occurred in August and Dr. Oldham was not banned until the end of November. Comparing the temporal proximity of the disruptive behavior complaint with Dr. Oldham's statements to Kirby make it plausible that the firing was due to his protected activities, not his behavior. Centra is free to make arguments at summary judgment that its actions were not pretextual. However, at this stage, taking Plaintiff's facts as true, the Court concludes that the allegations are sufficient to allege knowledge on the part of Centra and its decision makers.

### 3. Adverse Action in Retaliation (Causation)

The final prong in the retaliation analysis requires Dr. Oldham to establish that Centra retaliated against him because of the acts he took in furtherance of an FCA or a VFATA lawsuit, or as part of an effort to stop violations of the FCA. Stated differently, the FCA's language requires a showing of but-for causation. *See United States ex rel. Cody v. ManTech Int'l, Corp.*, 746 F. App'x 166, 177 (4th Cir. 2018).

"An employer undertakes a materially adverse action opening it to retaliation liability if it does something that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Grant*, 912 F.3d at 203 (quoting *Smith*, 796 F.3d at 434). A plaintiff's termination "following close on the heels of his numerous complaints" represents the "ultimate action an employer can take" against a reasonable worker for engaging in protected activity. *Id.* As the Fourth Circuit explained, "close temporal proximity" between protected activity and adverse action satisfies the third element. *United States ex rel. Complin v. North Carolina Baptist Hospital*, 818 F. App'x. 179, 185 (4th Cir. 2020) ("In the absence of direct evidence of causation, close temporal proximity between protected activity (or an employer's

knowledge of protected activity) and an adverse employment action may give rise to an inference of causation.").

Dr. Oldham sufficiently alleges that his firing was due to his protected activity. He made statements on November 23, 2017 to Kirby about filing complaints which he hoped would lead to the replacement of "Mr. Tibbs, Mr. Baker, and Ms. Riggins." Dkt. 19 ¶¶ 84–85. Just two business days later, Dr. Oldham suffered an adverse employment action when he was banned from Centra facilities. *Id.* ¶ 86. Banishing an employee from the workplace would certainly dissuade any reasonable worker from making a charge against his employer—especially when, as it did here, happens so soon after sharing an intent to file complaints against other managers. The temporal proximity between his statements to Kirby and his subsequent ban are sufficient to satisfy the causation prong.

Accordingly, the Court concludes that Dr. Oldham has alleged facts sufficient to state a claim for retaliation under the FCA and the VFATA.

## B. Breach of Contract

Dr. Oldham also asserts a breach of contract claim against Centra. Specifically, he alleges that Centra breached Section 8 of the PSA, which requires Centra to provide notice of a physician's breach of duty and allow the physician 30 days to cure such breach. Dkt. 19-1 at 9. Centra argues that the breach of contract claim fails because Dr. Oldham is neither a party to nor an intended beneficiary of the PSA between Centra and LHOC. *See* Dkt. 19 ¶ 31; Dkt. 19-1.

Virginia Code § 55-22 reads:

> [I]f a covenant or promise be made for the benefit, in whole or in part, of a person with whom it is not made, or with whom it is made jointly with others, such person, whether named in the instrument or not, may maintain in his own name any action thereon which he might maintain in case it had been made with him only and the consideration had moved from him to the party making such covenant or promise.

Virginia courts recognize a critical difference between merely being a person or entity that will benefit from an agreement between other parties (incidental beneficiary), and the very different situation in which a contract is entered into with the express purpose of conferring a benefit on a third party (intended beneficiary). *See Envtl. Staffing Acquisition Corp. v. B & R Const. Mgmt., Inc.*, 725 S.E.2d 550, 555 (Va. 2012). An incidental beneficiary has no rights against the promisor or the promisee, *Copenhaver v. Rogers*, 384 S.E.2d 593, 596 (Va. 1989), while an intended beneficiary may bring suit if the contract entered into was done so with the express purpose of conferring a benefit, *Envtl. Staffing*, 725 S.E.2d at 555.

To qualify as an "intended beneficiary," the third party need not be "expressly" named in the contract. Instead, the Supreme Court of Virginia looks beyond the four corners of the contract to the "surrounding circumstances." *Tingler v. Graystone Homes, Inc.*, 834 S.E.2d 244, 268 (Va. 2019) ("While a contract may expressly state such an intent to benefit a third party, evidence of such intent need not be limited to the four corners of the contract."). Thus the Court will consider the entirety of the underlying 2014 PSA between LHOC and Centra to determine whether the contract was made with the express purpose of conferring a benefit to Dr. Oldham.

To start, Section 8 itself does not support Dr. Oldham's contention that he is an intended beneficiary. Section 8 is designed to protect Centra from liability due to unprofessional conduct on the part of LHOC employees by giving Centra a procedure to follow when LHOC physicians fail to adhere to ethical and professional standards.[4] What Section 8 does not purport to do, is

---

[4] Of note, Section 7 of the contract characterizes all LHOC employees and its independent contractors as independent contractors of Centra. Dkt. 39-1 at 8 ("The Group and its employees and independent contractors shall at all times under this Agreement act and perform as independent contractors of Centra."). Therefore, the PSA contemplates that LHOC physicians will work at Centra facilities but that LHOC will employ and pay those physicians directly. In turn, Centra is responsible for paying LHOC for those physicians' services.

give any LHOC physician a right-to-sue or grant physicians any affirmative enforcement rights. Dr. Oldham argues that Section 8 identifies "separate benefits" for physicians because they "shall have thirty (30) days after notice to cure [a] breach." Dkt. 38-1 at 9. But read in context, this "separate benefit" does not support an intended beneficiary theory. Physicians have a high standard of professional conduct and competence that differs from generic hospital employees. Separating physicians out in a manner that shields Centra from liability for failure to meet those standards does not automatically make those physicians intended beneficiaries. In fact, Dr. Oldham points to no language in Section 8 that would counsel a different result. Nor does the Court find the argument that because Dr. Oldham was a top physician during the merger, that LHOC and Centra intended to confer a benefit to him through their contractual agreement.

Another telling provision is the PSA's "Benefit Assignment" section. Section 18 states that the PSA "shall inure to the benefits of and be binding upon the Parties hereto . . . ." Dkt. 38-1 at 17. The language of the provision explicitly limits any benefits or obligations to the contracting parties—Centra and LHOC. Nowhere does Section 18 explicitly, or implicitly, identify any LHOC physicians by name, position, or group, who should be considered a third party intended beneficiary to the contract. Indeed, the text confirms that the only parties with rights under the PSA are Centra and LHOC. Dr. Oldham asks the Court to read Section 18 as limited only to addressing Centra and LHOC's re-assignment rights under the PSA. However, his reading of the provision is too narrow. He is correct that Section 18 contemplates two scenarios where re-assignment is permitted,[5] but underlying those re-assignment scenarios is the first clause of the provision which clearly limits the rights and obligations under the contract to

---

[5] Those exceptions are for (1) instances where LHOC or Centra assigns their rights with "prior written consent of the other Party," or (2) Centra's assignment of its rights and obligations to "Centra Medical Group, LLC or Centra Southside Community Hospital, Inc., or any other affiliate or a wholly-owned subsidiary of Centra, without such consent." *Id.*

15

LHOC and Centra. For this reason, Dr. Oldham's reading of Section 18 is unpersuasive.

Taken in its totality, the PSA does not identify or contemplate any third party beneficiaries. The plain language of the contract shows that Centra and LHOC are in privity and that Dr. Oldham is an employee of LHOC and functions as an independent contractor to Centra. *Envtl. Staffing*, 725 S.E.2d at 554 (quoting *Century Indem. Co. v. Esso Standard Oil Co.*, 79 S.E.2d 625, 629 (Va. 1954)) ("It would be difficult to imagine a more unequivocal mode of negativing any . . . intention to benefit third parties than an express stipulation in the instrument to the effect that it is for the sole benefit of the obligee named therein."). Accordingly, the Court finds that Dr. Oldham is not an intended beneficiary and that Count 3 against Centra should be dismissed with prejudice.

## V.     CONCLUSION

For the reasons discussed, the Court will grant Defendant's motion to dismiss in part and deny it in part. Dkt. 28. The Court will deny Defendant's motion to dismiss counts 1 and 2. The Court will grant Defendant's motion to dismiss count 3. The Clerk of the Court is directed to send a copy of this Memorandum Opinion and accompanying Order to Defendant and all counsel of record.

Entered this __12th__ day of July, 2021.

_____
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE