CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
6/8/2023
LAURA A. AUSTIN, CLERK
BY: s/ ARLENE LITTLE
      DEPUTY CLERK

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
LYNCHBURG DIVISION

DWIGHT OLDHAM,

          *Plaintiff,*

   v.

CENTRA HEALTH, INC.,

          *Defendant.*

CASE NO. 6:18-cv-88

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

    This case comes before the Court on cross-motions for summary judgment, Dkts. 91, 93. Plaintiff-Relator Dwight S. Oldham, M.D., ("Oldham") filed suit claiming Centra Health, Inc., violated the False Claims Act ("FCA") and Virginia Fraud Against Taxpayers Act by retaliating against him for reporting Medicare fraud. The parties disagree about the merit of Oldham's sole remaining claim—his FCA retaliation claim—and seek summary judgment.

## I.    Background

    In 1981, Oldham began working for Lynchburg Hematology Oncology Clinic ("LHOC"). Dkt. 107 (Ex. A) at 472. In 2014, most LHOC employees became Centra Health, Inc. employees, based on a Professional Services Agreement ("PSA"). *Id.* at 474. Wait times and bills increased, and Oldham raised these concerns through "multiple meetings with Centra administration about patients' bills." Dkt. 107 (Ex. A) at 475; Dkt. 96 (Ex. 1) at 211–12. He met with the chairman of the board, Walker Sydnor, and Centra's CEO, E.W. Tibbs. Dkt. 107 (Ex. A) at 475. Carol Riggins, Centra's Oncology Manager, came to his office, and Oldham told her: "The easiest way to address this would be to pull out of the PSA and go back to what we were doing." *Id.* at 476. Though he "did not see what [he] was saying []as threatening to her personally," "apparently she

took it that way." *Id.* at 477. Oldham also objected to breast imaging overutilization concerns before Centra acquired LHOC but "didn't really make too much of an effort to change things" because it was "not [his] problem." Dkt. 96 (Ex. 1) at 213–14.

At oncology service-line meetings in the spring and summer of 2016, Oldham raised that Centra was engaging in medically unnecessary care. *Id.* at 503–05. In November 2016, Oldham complained to Tibbs about excessive breast MRIs and self-referring. *Id.* at 505. Tibbs "said that this wasn't good or that he heard [Oldham's] complaints, [and] that he was going to look into it and take care of it." *Id.* at 506.

From July 2015 to November 2017, Centra received at least thirteen complaints about Oldham's hostile workplace conduct. *See* Dkt. 96 (Ex. 1) at 31–32, 152–53, 163, 174, 195, 246, 249; Dkt. 96 (Ex. 3) at 35–43; Dkt. 96 (Ex. 4) at 11–13; Dkt. 96 (Ex. 6) at 116–17, 118, 120, 132; Dkt. 96 (Ex. 7) at 28, 93, 97; Dkt. 96 (Ex. 8); Dkt. 96 (Ex. 9) at 57–62.

Practice manager Katie Kirby, Dkt. 107 (Ex. A) at 83, emailed Managing Director of the Pearson Cancer Center Carol Riggins, *id.* at 57, in November 2016. Dkt. 92 (Ex. H). The email's subject line was "Is this ok?" and the email was addressed to Centra's HR Director, Karen Ackerman. *Id.* The email presented concerns that, once Curt Baker was removed from being vice president for medical oncology, Oldham would "come after" Riggins and Dr. Hilliard, a radiation oncologist. *Id.*; Dkt. 107 (Ex. A) at 88. In her deposition, Kirby indicated this was part of "coaching" from Riggins and Michael Elliott, Centra's Chief Operating Officer, to make Oldham "sound more physically threatening." Dkt. 92 (Ex. B) at 43, 30. Kirby also emailed Baker on May 11, 2017, sending an attachment listing examples of Oldham's 'threatening' statements. Dkt. 92 (Ex. I). In her deposition, she said Oldham was joking when making the allegedly threatening statements, and that those present when the statements were made laughed

together at them. Dkt. 96 (Ex. B) at 53–54; *see also* Dkt. 107 (Ex. A) at 421. On May 12, Kirby sent an edited version of the document listing examples of the allegedly threatening statements to Elliott. Dkt. 92 (Ex. J). She claims he told her to hold onto the document until after Oldham signed a second PSA, but Elliott denies giving that instruction. Dkt. 92 (Ex. B) at 37–38; Dkt. 92 (Ex. F) at 66–67 (Riggins saying Elliott told her Oldham's behavior would be addressed after contract signing); Dkt. 92 (Ex. K) at 23, 46–48 (Elliott indicating it was a misunderstanding).

Ackerman interviewed Dr. Hilliard based on her complaint about Oldham's behavior. Dkt. 92 (Ex. L). Dr. Hilliard explained Oldham "is smart and aggressive in manipulating things," that she "hear[d] there has been some reclassification of funds," that she thought the new survivor care plan program "process is subpar compared to what it could be" and "they're making stuff up," and Oldham "tried to make [her] billing person look bad . . . another example of how he creates such an adversarial relationship. Or is there [sic] accounting sloppy." *Id.* Soon after, on August 22, 2017, Oldham received a formal reprimand. Dkt. 92 (Ex. M).

Regarding funding concerns that Oldham raised, Chair of the Centra Foundation Board Dr. Mark Townsend "launched an ethics investigation into Mr. Tibbs' behavior relative to the way that he had moved funding from the foundation using the Foundation Board." Dkt. 92 (Ex. N) at 26.[1] The fund transfer triggered bonuses for Tibbs and "his executive team of about 35 individuals." *Id.* at 27–28. Further, Medicare published data showing Centra performed breast imaging at a rate more than five times greater than the Virginia average (37.9% compared with 7.3%). Dkt. 92 (Ex. O) at 1. The report stated "a rate higher than 14% may mean there is unnecessary follow-up." *Id.* Oldham shared this report in the spring and summer of 2016 and was accused of being "difficult" and "hostile." Dkt. 107 (Ex. A) at 504. He also discovered in

---

[1] Dr. Townsend does not clarify in his deposition when this investigation occurred.

August 2017 that the form Centra used to request breast imaging was pre-checked to allow mammographers to perform any test deemed necessary, bypassing Medicare's requirement that a different physician order the test, permitting mammographers to instead self-refer. *Id.* at 528–29. Oldham began researching Medicare regulations to determine if he had a viable FCA claim. *Id.* at 529–30.

On September 20, 2017, Carol Riggins emailed Michael Elliott, explaining Katie Kirby told her Oldham "continues to say mean and degrading things about me to her, and I know to others. But never anything threatening." Dkt. 92 (Ex. Q). She explained she and Baker "nudged [Kirby] to share some [of Oldham's] more devious plans" with Elliott. *Id.* On November 13, 2017, Shannon Meadows, then-HR Business Partner for the Centra Medical Group, relayed to Elliott that Kirby informed her Oldham was creating a "pervasively hostile work environment." Dkt. 92 (Ex. R). The next day, Elliott responded that he had "not heard of anything considered a hostile work environment, but [saw] an operational issue that should be handled as such." *Id.*

Oldham attended a meeting in November 2017 with Archway Analytics, an organization that analyzed Oncology Care model ("OCM") data. Dkt. 107 (Ex. A) at 534. OCM is a program created by Medicare to save money and improve care, which Centra agreed to follow. *Id.* at 488; Dkt. 92 (Ex. Z) (OCM Participation Agreement). Following his conference call with Archway Analytics, Oldham "decided that OCM was likely hopeless, that we were not going to be showing any improvement in financial performance, that Centra was . . . going to continue to misappropriate the [patient per month "MEOS"] money. And that [he] was wasting [his] time on OCM." Dkt. 107 (Ex. A) at 536. On November 24, 2017, he went to Centra to "review[] documents and prepar[e] [his] complaint to Medicare about Centra billing practices, specifically breast imag[ing], MRI, and also the MEOS payments." *Id.* at 537. He saw Kirby and let her

know that he "was going to file [a] complaint with Medicare, OIG" and that "hopefully, if [he] filed a complaint and there was an investigation, the people that were responsible for that would get fired. An[d] that was EW Tibbs, Curt [Baker], and Carol [Riggins]." *Id.* at 537–39.

Kirby called Baker on November 28 and alerted him. Dkt. 92 (Ex. B) at 33. Elliott called and asked her to memorialize what happened. *Id.* She emailed Elliott, claiming Oldham told her "his plan included 'going after' Ew Tibbs [sic], Curt Baker, and Carol Riggins." Dkt. 92 (Ex. T).

After Elliott learned of Oldham's plan, he organized a 6:30 AM meeting the next day with "necessary parties," including Tibbs and Ackerman. Dt. 92 (Ex. K) at 68–69, 71; Dkt. 92 (Ex. U) at 126. VP of HR Ackerman claims she decided to ban Oldham from the property. *Id.* at 134–36, 144. However, Townsend, Kirby, and Baker indicated that Tibbs terminated Oldham. Dkt. 92 (Ex. N) at 16; Dkt. 92 (Ex. B) at 52; Dkt. 92 (Ex. AA) at 156. On December 1, 2017, Oldham reported Centra for Medicare fraud. Dkt. 92 (Ex. V). On December 5, he emailed the Centra Board of Directors, complaining of Medicare fraud, OCM obstruction, and MRI overutilization. Dkt. 92 (Ex. W). About 25 minutes later, Tibbs emailed the Centra employees conveying that Centra permanently banned Oldham. Dkt. 92 (Ex. X); *see also* Dkt. 92 (Ex. B) at 51 (Kirby testifying that she thought Tibbs "would do whatever he had to do to stop [Oldham filing a government report], including firing him, like he did."); *id.* at 46 ("I think [Tibbs] just – when he'd had enough of Dr. Oldham reporting them and doing that kind of thing, then he just got rid of them."); Dkt. 92 (Ex. N) at 16 (Townsend testifying that Tibbs fired Oldham for an alleged threatening comment); *id.* at 17 (Townsend describing Oldham as "a casualty of Mr. Tibbs'."). Tibbs' email never says he fired Dr. Oldham—it simply informs Centra employees that Dr. Oldham "was removed from the workplace last Thursday and asked not to return to any Centra facility unless he is seeking medical care for himself or a family member." Dkt. 92 (Ex.

X). Still, Tibbs took responsibility for the situation as CEO, stating: "As the CEO of Centra, I have two responsibilities related to this situation, both of which I take incredibly seriously: I must keep patients safe, and I must protect our team members. Dr. Oldham's behavior impacts the safety of our team members on which I will not compromise." *Id.*

### III. Standard of Review

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable [fact finder] could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018).

The moving party bears the burden of establishing that summary judgment is warranted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party meets this burden, the nonmoving party must set forth specific, admissible facts to demonstrate a genuine issue of fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The non-movant may not rest on allegations in the pleadings; rather, it must present sufficient evidence such that a reasonable fact finder could find by a preponderance of the evidence for the non-movant. *See Celotex Corp.*, 477 U.S. at 322–24; *Sylvia Dev. Corp. v. Calvert Cnty, Md.*, 48 F.3d 810, 818 (4th Cir. 1995). The district court must "view the evidence in the light most favorable to the nonmoving party" and "refrain from weighing the evidence or making credibility determinations." *Variety Stores, Inc.*, 888 F.3d at 659.

When cross-motions for summary judgment are before a court, a court must "consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Defs. of Wildlife v. N.C. DOT*, 762 F.3d 374, 392 (4th Cir. 2014)

(quoting *Bacon v. City of Richmond, Va.*, 475 F.3d 633, 638 (4th Cir. 2007) (internal quotation marks omitted)).

## II. Analysis

To prevail on an FCA retaliation claim, a relator must show: "(1) he engaged in protected activity; (2) his employer knew about the protected activity; and (3) his employer took adverse action against him as a result." *United States ex rel. Grant v. United Airlines, Inc.*, 912 F.3d 190, 200 (4th Cir. 2018) (internal citations omitted). As material issues of fact exist as to these elements, the Court will deny both motions for summary judgment.

### A. Protected Activity

The Fourth Circuit recognizes two types of protected activity under 31 U.S.C. § 3730(h): (1) acts "in furtherance of an [FCA action]," or (2) "other efforts to stop 1 or more [FCA violations]." *Id.* (quoting 31 U.S.C. § 3730(h)). And "an act constitutes protected activity where it is motivated by an objectively reasonable belief that the employer is violating, or soon will violate, the FCA." *Id.* at 201. Further, "[a] belief is objectively reasonable when the plaintiff alleges facts sufficient to show that he believed his employer was violating the FCA, that this belief was reasonable, that he took action based on that belief, and that his actions were designed to stop one or more violations of the FCA." *Id.* at 201–02.

For Oldham's retaliation claim to succeed, he must ultimately show he was acting in furtherance of an FCA action or making other efforts to stop one or more violations. The Fourth Circuit interprets "other efforts" to include investigative acts, such as "collecting information about a possible fraud, even before the plaintiff puts together 'all the pieces of the puzzle.'" *Young v. CHS Middle East, LLC*, 611 Fed. Appx. 130, 133 (4th Cir. 2015) (internal citations omitted); *see also Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 434 (4th Cir. 2015).

First, consider Oldham's actions in relation to trying to stop overutilization of MRIs and false claims for payment to Medicare. Oldham complained about overutilization of MRIs, as confirmed by witness depositions. *See, e.g.*, Dkt. 92 (Ex. B) at 58–62. He testified that he raised at oncology service-line meetings in the spring and summer of 2016 that Centra was engaging in medically unnecessary care. Dkt. 107 (Ex. A) at 503–05. And in November 2016, Oldham complained to CEO Tibbs about excessive breast MRIs and self-referring. *Id.* at 505. He "started reviewing Medicare regulations" and "mak[ing] some estimates and extrapolations of how many inappropriate tests they were ordering and how much money that involved." *Id.* at 529. He determined "the answer to that was maybe $10 million. So under the false-claims act, that would generate a claim of triple damages, $30 million." *Id.* at 529–30.

Second, consider Oldham's complaints about Centra's misappropriation of Medicare MEOS money. Centra enrolled in the OCM and received government money upfront in the amount of $160 per patient per month. Dkt. 92 (Ex. Z) at 30. The Centers for Medicare & Medicaid Services ("CMS"), per the OCM Participation Agreement, "shall recoup" the MEOS payment from the Practice if . . . CMS determines that the Practice has failed to provide Enhanced Services." *Id.* at 30. Oldham complained Centra was not trying to reduce costs and was only using a small fraction of the MEOS payments for OCM expenses. Dkt. 107 (Ex. A) at 497; *id.* at 527. He believed "if someone is not complying with this OCM agreement" the individual "would have committed a false-claims-act violation." *Id.* at 500.

Defendant argues "there is no evidence in the record that [Oldham's] complaints referenced fraudulent claims, Medicare fraud, or illegal activity." Dkt. 106 at 9 (internal reference omitted). Defendant also contends Oldham's worries "about improving breast imaging practices to decrease unnecessary testing and increase the quality of patient care fall short of the

'specific illegal, fraudulent conduct against the government' required to establish that he had an objectively reasonable belief that Centra's breast imaging practices amounted to a violation of the FCA." Dkt. 95 at 22–23 (citing *Grant*, 912 F.3d at 202). But based on Medicare's report, Dkt. 92 (Ex. O), Oldham's conference call with Archway Analytics, Dkt. 107 (Ex. A) at 534, and his discovery that Centra's form to request breast imaging was pre-checked, *id.* at 528–29, a reasonable juror could find that Oldham reasonably believed Centra was committing Medicare fraud. He told Kirby he would file a complaint with "Medicare, OIG." *Id.* at 538. And he eventually went to Centra's Board, and he filed a complaint with the government before his permanent ban. Dkt. 92 (Ex. V); Dkt. 92 (Ex. W); Dkt. 92 (Ex. X).

Like the Youngs who "expressed concern" about CHS' use of expired medicine to "supervisors" and at a "staff meeting," *Young*, 611 Fed. Appx. at 131, Oldham raised his concerns at meetings and then directly with Tibbs and the Board. He made complaints "on multiple occasions in person and in writing," like a relator whose FCA retaliation claim was affirmed by the Fourth Circuit. *Grant*, 912 F.3d at 202.

### B. Notice

The notice element of an FCA retaliation claim does not require actual notice of an FCA action. *See Smith*, 796 F.3d at 433. When Congress amended the statute to expand protected activity to include "other efforts," the element of notice was also expanded. *Id.* at 434, 434 n.6; *United States ex rel. Reed v. KeyPoint Gov't Solutions*, 923 F.3d 729, 766 (10th Cir. 2019).

Defendant and Oldham disagree as to whether Ackerman or Tibbs/Centra was the relevant decisionmaker who needed to be on notice for an FCA retaliation claim to move forward. This is a question for the jury. A reasonable juror could find that Ackerman, Tibbs, and Centra were all on notice of Oldham's efforts to stop fraud. *See, e.g.*, Dkt. 92 (Ex. K) at 31

(Elliott confirming Centra launched an investigation because of Oldham's complaints); Dkt. 92 (Ex. AA) at 172 (Baker discussing that it appeared Oldham threatened to report Centra to the government). On November 24, 2017, Oldham went to Centra to "review[] documents and prepar[e] [his] complaint to Medicare . . . ." *Id.* at 537. There, he let Kirby know that he "was going to file [a] complaint with Medicare, OIG" and "hopefully, if [he] filed a complaint and there was an investigation, the people that were responsible for that would get fired. . . . EW Tibbs, Curt [Baker], and Carol [Riggins]." *Id.* at 537–39. Kirby alerted Baker. Dkt. 92 (Ex. B) at 33. She emailed Elliott claiming Oldham told her "his plan included 'going after' Ew Tibbs [sic], Curt Baker, and Carol Riggins." Dkt. 92 (Ex. T). And Ackerman and Tibbs were contacted about the 6:30 AM meeting on November 29, 2017—the meeting where attendees evidently reached a consensus about removing Oldham. Dkt. 96 (Ex. 9) at 71, 75–76; Dkt. 96 (Ex. 6) at 124–26, 129.

Defendant also argues regarding the notice element that "Plaintiff cannot genuinely dispute that he never characterized his billing or breast imaging concerns as Medicare fraud or FCA violations until *after* he was banned from Centra," and instead "presented his concerns in the context of complex medical judgments." Dkt. 95 at 23. Again, this is a jury question. A reasonable juror could agree or disagree with Defendant's conclusion.

### C. Causation

The causation element presents the greatest dispute of material fact. "In the absence of direct evidence of causation, close temporal proximity between protected activity (or an employer's knowledge of protected activity) and an adverse employment action may give rise to an inference of causation." *United States ex rel. Complin v. North Carolina Baptist Hosp.*, 818 Fed. Appx. 179, 185 (4th Cir. 2020) (citing *Grant*, 912 F.3d at 195, 203). Here, Oldham was permanently banned on December 5, 2017, 25 minutes after emailing the Board and only four

days after sending his first complaint to the government. Dkt. 92 (Ex. W); Dkt. 92 (Ex. V); Dkt. 92 (Ex. X). *Compare with United States ex rel. Cody v. ManTech Int'l, Corp.*, 746 Fed. Appx. 166, 180–82 (4th Cir. 2018) (indicating six months was too long a temporal gap to give rise to an inference of causation, but ten weeks may be sufficient).

"In a burden-shifting case, [a plaintiff] meets [his] ultimate burden at the third stage of the analysis by showing pretext." *Id.* at 178. Reasonable jurors could disagree as to whether Centra's pretext—the hostile environment complaints—is worthy of belief. In her deposition, Kirby stated, regarding her May 12, 2017 letter complaining about Oldham, that she was "coached on how to write it." Dkt. 92 (Ex. B) at 29–30; *see also id.* at 43 (discussing that Carol Riggins gave her "input on what to write when [she] submit[ted] these complaints"); *id.* at 108–109 (discussing that Carol Riggins coached her and Michael Elliott told her to submit the letters). She also testified that she thought Tibbs was pressuring her through Elliott. *Id.* at 110–11. And to her knowledge, Oldham was never "physically threatening to anybody in th[e] building during the eleven years that [she] worked there." *Id.* at 111. Still, from July 2015 to November 2017, Centra received at least thirteen complaints about Oldham's hostile workplace conduct, from multiple sources. Reasonable jurors could disagree about whether, based on the other hostile work environment-related complaints, Oldham's termination was directly related to FCA protected activity. Thus, both motions for summary judgment will be denied.

## V. Conclusion

For the foregoing reasons, both motions for summary judgment as to Oldham's FCA retaliation claim will be denied.

The Clerk of the Court is directed to send a certified copy of this Memorandum Opinion and accompanying Order to all counsel of record.

Entered this \_\_8th\_\_ day of June, 2023.

_____
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE